**JENNER & BLOCK LLP**
Kate T. Spelman (SBN 269109)
kspelman@jenner.com
515 S. Flower Street, Suite 3300
Los Angeles, CA 90071
Telephone: (213) 239-5100
Facsimile: (213) 239-5199

**JENNER & BLOCK LLP**
David C. Layden (*pro hac vice*)
dlayden@jenner.com
353 North Clark Street
Chicago, IL 60654
Telephone: (312) 222-9350
Facsimile: (312) 527-0484

Attorneys for Defendant
Nuance Communications, Inc.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

DANA TURNER, DANIEL SMITH, and AARON YOUSHEI, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

NUANCE COMMUNICATIONS, INC.,

Defendant.

Case No. 4:22-cv-05827-DMR
*Consolidated with 4:23-cv-00797-DMR*

**DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND TO STAY THE ACTION PENDING ARBITRATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

[Declaration of Christopher D. Moore, Declaration of Anna R. Kwait, Declaration of Laura Deck, Declaration of William Garrett, Declaration of Kate T. Spelman filed and [Proposed] Order lodged concurrently]

Judge: Honorable Donna M. Ryu

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on October 26, 2023, at 1:00 p.m., or as soon thereafter as counsel may be heard in Courtroom 4 of the Ronald V. Dellums Federal Building and United States Courthouse, 1301 Clay Street, Oakland, California 94612, Defendant Nuance Communications, Inc. will, and hereby does, move the Court, under the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*, for an order compelling Plaintiffs Dana Turner, Daniel Smith, and Aaron Youshei to arbitrate their alleged claims against Nuance on an individual basis under the terms of Plaintiffs' binding arbitration agreements with JPMorgan Chase Bank, N.A. and the doctrine of equitable estoppel. Nuance also requests that the Court stay this action under the FAA, 9 U.S.C. § 3, pending the outcome of the individual arbitration proceedings.

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the concurrently filed Declarations of Christopher D. Moore, Anna R. Kwait, Laura Deck, William Garrett, and Kate T. Spelman, and the pleadings and other materials filed with the Motion, and on such other and further oral and documentary evidence as may be presented at the hearing on the Motion.

Dated: July 31, 2023

JENNER & BLOCK LLP

By: /s/ Kate T. Spelman
Kate T. Spelman
David C. Layden

Attorneys for Defendant
Nuance Communications, Inc.

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

I. INTRODUCTION ........ 1

II. BACKGROUND ........ 3

A. Each Plaintiff Opened A Chase Account And Agreed To The Governing Deposit Account Agreement. ........ 3

B. Plaintiffs Received Benefits By Accepting The Chase Deposit Account Agreements. ........ 5

C. The Chase Deposit Account Agreements Require Individual Arbitration Of Any Disputes About The Deposit Account Agreements, Plaintiffs' Accounts, Transactions Involving Their Accounts, Or Related Services. ........ 6

D. Plaintiffs Assert Claims About Chase Voice Authentication—Which Relate To Their Accounts, Their Deposit Account Agreements, Transactions Involving Their Accounts, And Related Services Chase Provides—While Seeking To Avoid Their Agreements To Arbitrate Their Claims. ........ 7

III. ARGUMENT ........ 9

A. Under the FAA, Courts Enforce Valid Agreements to Arbitrate ........ 9

B. The Arbitration Agreements Are Valid. ........ 11

C. Plaintiffs' Claims Are Within The Scope Of The Arbitration Agreements ........ 13

D. This Court Should Enforce Plaintiffs' Agreements To Individually Arbitrate Their Alleged Claims Under The Doctrine Of Equitable Estoppel. ........ 15

1. Plaintiffs' claims are "intimately founded in and intertwined with" the Deposit Account Agreements. ........ 15

2. Plaintiffs allege substantially interdependent and concerted misconduct by Chase and Nuance, and their allegations are connected with the obligations of the Deposit Account Agreements. ........ 18

IV. THE ACTION SHOULD BE STAYED PENDING THE OUTCOME OF ARBITRATION. ........ 20

V. CONCLUSION ........ 21

# TABLE OF AUTHORITIES


**Page(s)**

**Cases**

*Akar v. Prescott Hotel*, No. 07-4531, 2008 WL 2265184 (N.D. Cal. June 2, 2008) ....................10

*Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265 (1995) ....................10

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011) ....................10

*AT&T Techs., Inc. v. Comm'ns Workers of Am.*, 475 U.S. 643 (1986) ....................13

*Balanzar v. Fid. Brokerage Servs., LLC*, No. 22-CV-1372-GPC, 2023 WL 1767011 (S.D. Cal. Feb. 3, 2023) ....................9

*Bitstamp Ltd. v. Ripple Labs Inc.*, No. 15-CV-01503, 2015 WL 4692418 (N.D. Cal. Aug. 6, 2015) ....................13

*Boucher v. All. Title Co.*, 127 Cal. App. 4th 262 (2005) ....................17

*Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) ....................13

*Capriole v. Uber Techs., Inc.*, 7 F.4th 854 (9th Cir. 2021) ....................10

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126 (9th Cir. 2000) ....................10

*Circuit City Stores, Inc. v. Ahmed*, 283 F.3d 1198 (9th Cir. 2002) ....................13

*Cooper v. Adobe Sys. Inc*, No. 18-CV-06742, 2019 WL 5102609 (N.D. Cal. Oct. 11, 2019) ....................13

*Dill v. JPMorgan Chase Bank, N.A.*, No. 19-10947, 2020 WL 4345755 (S.D.N.Y. July 29, 2020) ....................14

*Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018) ....................10

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995) ....................11

*Franklin v. Cmty. Reg'l Med. Ctr.*, 998 F.3d 867 (9th Cir. 2021) ....................15, 16, 17, 20

*Goldman v. KPMG, LLP*,
173 Cal. App. 4th 209 (2009) ....................19

*Green Tree Fin. Corp.-Ala. v. Randolph*,
531 U.S. 79 (2000)....................11

*Johnson v. JPMorgan Chase Bank, N.A*,
No. 17-2477, 2018 WL 4726042 (C.D. Cal. Sept. 18, 2018) ....................13, 15

*Kramer v. Toyota Motor Corp*.,
705 F.3d 1122 (9th Cir. 2013) ....................17

*Mance v. Mercedes-Benz USA*,
901 F. Supp. 2d 1147 (N.D. Cal. 2012) ....................15, 16

*Metalclad Corp v. Ventana Environmental Org. P'ship*,
109 Cal. App. 4th 1705 (2003) ....................17

*Mohamed v. Uber Techs., Inc*.,
848 F.3d 1201 (9th Cir. 2016) ....................12

*Molina v. Scandinavian Designs, Inc*.,
No. 13-4256, 2014 WL 1615177 (N.D. Cal. Apr. 21, 2014)....................12

*Moses J. Cone Mem'l Hosp. v. Mercury Constr. Corp*.,
460 U.S. 1 (1983)....................10

*Ngo v. BMW of N. Am., LLC*,
23 F.4th 942 (9th Cir. 2022) ....................17

*Novak v. JP Morgan Chase Bank, NA*,
No. 06-CV-14862, 2008 WL 907380 (E.D. Mich. Mar. 31, 2008) ....................15

*Orozco v. Gruma Corp*.,
No. 20-1290, 2021 WL 4481061 (E.D. Cal. Sept. 30, 2021) ....................11

*In re Pac. Fertility Ctr. Litig*.,
814 F. App'x 206 (9th Cir. 2020) ....................15, 18, 19, 20

*Pinnacle Museum Tower Assn. v. Pinnacle Mkt. Dev. (US), LLC*,
55 Cal. 4th 223 (2012) ....................12

*Portland GE v. Liberty Mut. Ins. Co.*,
862 F.3d 981 (9th Cir. 2017) ....................13

*Prima Donna Dev. Corp. v. Wells Fargo Bank, N.A.*,
42 Cal. App. 5th 22 (2019) ....................10

*Russell v. BMW of N. Am., LLC*,
No. 22-3299, 2022 WL 18674435 (C.D. Cal. Oct. 14, 2022)....................15, 17

*Sanchez v. J.P. Morgan Chase Bank, N.A.*,
No. 14-20468, 2014 WL 4063046 (S.D. Fla. Aug. 15, 2014) ....................13

*Shearson/Am. Exp., Inc. v. McMahon*,
482 U.S. 220 (1987)....................10

*Sovak v. Chugai Pharm. Co.*,
280 F.3d 1266 (9th Cir. 2002)....................11

*Sunmonu v. Chase Bank, N.A.*,
No. 18-CV-1695, 2019 WL 1258788 (D. Md. Mar. 19, 2019)....................14

*Turtle Ridge Media Grp., Inc. v. Pac. Bell Directory*,
140 Cal. App. 4th 828 (2006), *as modified* (July 20, 2006)....................17

*Tyman v. Ford Motor Co.*,
521 F. Supp. 3d 1222 (S.D. Fla. 2021)....................20

*Victrola 89, LLC v. Jaman Properties 8 LLC*,
46 Cal. App. 5th 337 (2020)....................10

*Ziober v. BLB Res., Inc.*,
839 F.3d 814 (9th Cir. 2016)....................21

**Statutes**

9 U.S.C. § 1, *et seq*....................2, 9, 21

Cal. Civ. Proc. Code § 1281.4....................20

Cal. Penal Code § 631....................1, 8, 9

Cal. Penal Code § 632....................1, 8, 9

Cal. Penal Code § 637.3....................1, 8, 9

**Other Authorities**

American Arbitration Association Consumer Arbitration Rules,
https://www.adr.org/sites/default/files/Consumer-Rules-Web_0.pdf....................13

JAMS Streamlined Arbitration Rules & Procedures,
https://www.jamsadr.com/rules-streamlined-arbitration/#Rule-8....................13

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiffs are JPMorgan Chase Bank account holders who base their claims against Nuance Communications, Inc., a software technology provider, on their interactions with Chase's customer service center. In particular, they argue that when they called Chase's customer service center, Chase allegedly used Nuance's cloud-based "Gatekeeper" software to authenticate their identities to protect their accounts and their privacy.[1] They claim that in licensing this software to Chase for Chase's own use, Nuance—but not Chase—purportedly violated the California Invasion of Privacy Act ("CIPA"), sections 631, 632, and 637.3, by allegedly "examin[ing] and record[ing]" their "voice prints or other voice stress patterns without obtaining their express written consent." *See, e.g.*, ECF No. 34, Consolidated Amended Complaint ("CAC") ¶ 9. Plaintiffs thus rest their claims against Nuance on their relationships with Chase, their use of Chase's services, and their accounts with Chase.

But in choosing to open their accounts with Chase and in receiving the benefits of those accounts (including the measures Chase takes to keep their accounts secure, such as by using Nuance's voice authentication software), Plaintiffs accepted the Chase Deposit Account Agreement, thereby agreeing to individually arbitrate "[c]laims or disputes between you and us about your deposit account, transactions involving your deposit account, . . . and any related service or agreement with us." *See, e.g.*, Declaration of Laura Deck, Ex. A at 24–25. Plaintiffs are fully aware that their agreements to individually arbitrate their claims applies to the claims asserted here—as demonstrated by the fact Plaintiff Turner originally sued several Chase entities in addition to Nuance on the same grounds and theories of liability, *see* ECF No. 1, and voluntarily dismissed those Chase entities only after Chase reminded Turner of her binding agreement to

[1] Plaintiffs' allegation that Chase used cloud-based Gatekeeper software (which Plaintiffs describe as "software-as-a-service") when they called Chase is without basis; if this case reaches the discovery phase, discovery will show that Chase was not using cloud-based Gatekeeper software, but instead an "on-premises" software solution (meaning that the Nuance software was installed locally on Chase's own computer hardware, rather than Chase accessing software running in the cloud). Solely for purposes of this motion to compel arbitration, however, Nuance treats as true Plaintiffs' allegations that Chase used Nuance's cloud-based Gatekeeper software.

individually arbitrate her claims. Plaintiffs seek to avoid their agreements by filing this putative class action in this Court, and by doing so against Nuance instead of Chase. But the well-settled doctrine of equitable estoppel applies here and requires Plaintiffs to individually arbitrate their Chase-based claims against Nuance. The Court should therefore compel Plaintiffs to individual arbitration and should stay this action pending arbitration, FAA, 9 U.S.C. § 1, *et seq.*, for the following reasons:

*First*, each Plaintiff is bound by the obligations in their Chase Deposit Account Agreements, including the obligation to arbitrate disputes on an individual basis, because they affirmatively consented to the terms of the Agreements and did not opt out of the arbitration agreement.

*Second*, Plaintiffs' claims—which are based entirely on their interactions with the Chase customer service center and Chase's use of Nuance software to authenticate Plaintiffs so Plaintiffs could access Chase's services—fall within the scope of the arbitration agreements, which govern "[c]laims or disputes between you and us about your deposit account, transactions involving your deposit account, . . . and any related service or agreement with us[,]" including the Chase customer service center and Chase voice authentication. *See, e.g.*, Deck Decl. Ex. A at 24–25.

*Third*, Plaintiffs must individually arbitrate their claims against Nuance under the doctrine of equitable estoppel because their claims arise from alleged conduct by Nuance and Chase that is founded in and intertwined with the Deposit Account Agreements between Chase and each Plaintiff. Among other things, those agreements expressly provide that Chase "may record and/or monitor any of our telephone conversations with you" and "may use your voice to verify your identity," which is precisely what Plaintiffs allege occurred here. *See, e.g.*, Deck Decl. Ex. A at 19. Plaintiffs should not be permitted to bypass their contractual obligation to individually arbitrate claims about Chase voice authentication by strategically pursuing claims solely against Nuance, Chase's third-party technology provider. Equitable estoppel applies for the additional reason that Plaintiffs rest their claims against Nuance on interdependent conduct with Chase, a signatory to Plaintiffs' agreements.

## II. BACKGROUND

### A. Each Plaintiff Opened A Chase Account And Agreed To The Governing Deposit Account Agreement.

On January 20, 2021, Plaintiff Turner opened a Chase Total Checking account (the "2001 Account") digitally on the Chase.com website. Declaration of Christopher D. Moore ¶ 3. In connection with opening the 2001 Account, Plaintiff Turner was presented with and acknowledged receipt of the Deposit Account Agreement governing that account. *Id*. ¶ 6. Plaintiff Turner also executed a Personal Electronic Signature Card. *Id*. ¶ 7; *see also id*. Ex. A. By executing the Personal Electronic Signature Card, Plaintiff Turner "acknowledged that [she] received and agreed to be bound by the terms and conditions of Chase's Deposit Account Agreement governing [the 2001 Account]." Moore Decl. ¶ 10; *see also* Declaration of Anna R. Kwait ¶¶ 3–8 (describing process by which Plaintiff Turner opened the 2001 Account, including acceptance of terms of Deposit Account Agreement). The Deposit Account Agreement that governed Plaintiff Turner's 2001 Account when she opened it provided that it was "the basic agreement between you [Plaintiff Turner] and us (JPMorgan Chase Bank, N.A. or 'Chase')," and that "[b]y signing a signature card or submitting an account application, or by using any of our deposit account services, you and anyone else identified as an owner of the account agree to the terms in this agreement." Deck Decl. ¶ 3; *id.* Ex. A at 5.

On September 16, 2014, Plaintiff Smith opened a Chase Premier Plus Checking account (the "9693 Account") at Chase's Mission Street branch located in San Francisco, California, was presented with the Deposit Account Agreement governing that account, and executed a Personal Signature Card, in which he "acknowledged [he] received and agreed to be bound by the terms and conditions of Chase's Deposit Account Agreement governing [the 9693 Account] at the time it was opened." Moore Decl. ¶ 10; *see also* ¶¶ 5–6, 9; *id*. Ex. C (Deposit Account Agreement); Deck Decl. ¶ 6. The Deposit Account Agreement that governed Plaintiff Smith's 9693 Account when he opened it provided that it was "the contract that governs your account," that it was "the basic agreement between you [Plaintiff Smith] and us (JPMorgan Chase Bank, N.A. or any

affiliates where you have a deposit account)," and that "[b]y signing a signature card or application, or using any of our deposit account services, you and anyone else identified as an owner of the account agree to the terms contained in this agreement." Deck Decl. ¶ 7 & *id.* Ex. C at 2.

On November 26, 2013, Plaintiff Youshei opened a Chase College Savings account (the "5838 Account") at Chase's Beverly Hills Downtown branch located in Los Angeles, California, was presented with the Deposit Account Agreement governing that account, and executed a Personal Signature Card, in which he "acknowledged [he] received and agreed to be bound by the terms and conditions of Chase's Deposit Account Agreement governing [the 9693 Account] at the time it was opened." Moore Decl. ¶ 10; *see also id.* ¶¶ 4, 6, 8; *id.* Ex. B; Deck Decl. ¶ 4. The Deposit Account Agreement that governed Plaintiff Youshei's 5838 Account when he opened it provided that it was "the contract that governs your account," that it was "the basic agreement between you [Plaintiff Smith] and us (JPMorgan Chase Bank, N.A. or any affiliates where you have a deposit account)," and that "[b]y signing a signature card or application, or using any of our deposit account services, you and anyone else identified as an owner of the account agree to the terms contained in this agreement." Deck Decl. ¶ 5; *id.* Ex. B at 2.

"Chase makes copies of the effective Deposit Account Agreement available to every customer who holds a deposit account with Chase." Deck Decl. ¶ 8. "Since the time that [Plaintiffs] Turner, Youshei, and Smith opened their Chase deposit accounts, Chase has updated the Deposit Account Agreement for those accounts from time to time." *Id.* "Chase notifies its customers in writing of updates to the Deposit Account Agreement, in accordance with the Deposit Account Agreements." *Id.* ¶ 9; *id.* Ex. A at 22; *id.* Ex. B at 15–16; *id.* Ex. C at 16. "Chase provides customers such as [Plaintiffs] Turner, Youshei, and Smith with monthly account statements for their deposit accounts." *Id.* ¶ 10.

"Chase updated its Deposit Account Agreement with an effective date of November 8, 2020, and made the update available to customers like [Plaintiffs] Smith and Youshei, with [Plaintiff] Youshei's 5838 Account and Plaintiff Smith's 9693 Account both held open and active throughout all of 2020." *Id.* ¶ 11; *id.* Ex. A; *see also id.* ¶ 12; *id.* Ex. D (Deposit Account Agreement

in effect when Plaintiff Turner filed her action on October 6, 2022); *id.* Ex. E (Deposit Account Agreement in effect when Plaintiffs Youshei and Smith filed their action on February 22, 2023)).

**B. Plaintiffs Received Benefits By Accepting The Chase Deposit Account Agreements.**

Plaintiffs each received benefits by accepting and agreeing to be bound by the Deposit Account Agreements when they opened their respective accounts at Chase. For example, Chase provided Plaintiffs with the ability to conduct transactions involving those accounts and the ability to access the Chase customer service center, which Chase makes available only to accountholders. *See, e.g.*, Deck Decl. Ex. A at 1 ("We're here for you. See below for how to reach us."); *id.* at 10 ("You may use our automated customer service system or speak to us to get your account information, transfer funds between your accounts with us, or pay qualifying Chase loans or credit cards. You must have a valid deposit or loan account and a valid password or PIN to use the automated system."); *id.* Ex. B at 22 ("Telephone Banking"); *id.* at 34 (instructions on how to contact Chase); *id.* Ex. C at 22 ("Telephone Banking"); *id.* at 31 (instructions on how to contact Chase).

Plaintiffs also received the benefit of fraud prevention measures employed by Chase, as outlined in the Deposit Account Agreements. For instance, the Deposit Account Agreement in effect when Plaintiff Turner opened her 2001 Account in January 2021, and which also applied to Plaintiff Smith's 9693 Account and Plaintiff Youshei's 5838 Account effective November 8, 2020 (*see* Deck. Decl. ¶ 11), provided "there are many reasons we may decline or prevent transactions to or from your account, but we generally do it to protect you or us, or to comply with legal requirements. We may decline or prevent any or all transactions to or from your account. We may refuse, freeze, reverse or delay any specific withdrawal, payment or transfer of funds to or from your account, or we may remove funds from your account to hold them pending investigation, including in one or more of the following circumstances: . . . [w]e suspect that you may be the victim of a fraud, scam or financial exploitation, even though you have authorized the transaction(s) . . . [or] [w]e suspect that any transaction may involve illegal activity or may be

fraudulent." *Id.* Ex A. at 21; *see also id.* at 11 (providing that Chase may also refuse to authorize any transaction when the accountholder's debit or ATM card, connected to her deposit account, "has been reported lost or stolen or when [Chase] reasonably believe[s] there may be fraudulent, suspicious or illegal activity.").

In fact, Plaintiffs received the benefit of Chase's account protection mechanisms via Chase's use of voice authentication technology on its customer service telephone lines. On this point, the Deposit Account Agreement states: "[w]e may record and/or monitor any of our telephone conversations with you. If we do record, we do not have to keep the recordings, unless the law says we must. We may use your voice to verify your identity." *See id.* at 19.

### C. The Chase Deposit Account Agreements Require Individual Arbitration Of Any Disputes About The Deposit Account Agreements, Plaintiffs' Accounts, Transactions Involving Their Accounts, Or Related Services.

Each of the Deposit Account Agreements governing Plaintiffs' accounts include individual arbitration provisions (the "Arbitration Agreements"). The Arbitration Agreements provide that "any dispute relating in any way to your account or transactions will be resolved by binding arbitration as discussed below, and not through litigation in any court (except for matters in small claims court)." Deck Decl. Ex. A at 24–25. The Arbitration Agreements further provide that "[c]laims or disputes between you and us about your deposit account, transactions involving your deposit account, safe deposit box, and any related service with us are subject to arbitration." *Id*.

The Arbitration Agreements outline the procedures governing arbitration, including the applicable rules, the extent to which Chase will reimburse a claimant for the costs of arbitration, and the procedure for initiating a claim. *Id*. The Arbitration Agreements require each Plaintiff's claims to be arbitrated on an individual basis and preclude class litigation:

> YOU AND WE ALSO WAIVE ANY ABILITY TO ASSERT OR PARTICIPATE IN A CLASS OR REPRESENTATIVE BASIS IN COURT OR IN ARBITRATION.

*Id.* The Arbitration Agreements also preclude "seek[ing] to consolidate in arbitration any claims involving separate claimants (except for claimants who are on the same account), unless all parties

agree," or "seek[ing] any award or remedy in arbitration against or on behalf of anyone who is not a named party to the arbitration." *Id*.

The Arbitration Agreements provided each Plaintiff the opportunity to opt out of arbitration by calling a toll-free telephone number or speaking with a Chase banker within 60 days after opening their accounts. *Id*. Chase's records reflect that, despite this opportunity to do so, no Plaintiff contacted Chase to opt out of arbitration. Declaration of William Garrett ¶ 4.

**D. Plaintiffs Assert Claims About Chase Voice Authentication—Which Relate To Their Accounts, Their Deposit Account Agreements, Transactions Involving Their Accounts, And Related Services Chase Provides—While Seeking To Avoid Their Agreements To Arbitrate Their Claims.**

On September 27, 2022, Plaintiff Turner's counsel filed a complaint against Microsoft, Nuance, JPMorgan Chase & Co., and JPMorgan Chase Bank, N.A., on behalf of plaintiff Alfredo Chaidez in the Central District of California, alleging CIPA claims arising from Chaidez's calls to the Chase customer service center and his interactions with Chase voice authentication. *See* Declaration of Kate T. Spelman Ex. A. On September 29, 2022, *Chaidez* was assigned to the Honorable Percy Anderson. *See* Spelman Decl. Ex. B. A week after that assignment, Plaintiff Turner's counsel filed this substantially identical action against the same defendants on behalf of Plaintiff Turner in this Court. *See* ECF No. 1. Three days after the *Turner* defendants consented to the jurisdiction of this Court, Plaintiff's counsel voluntarily dismissed the *Chaidez* complaint. *See* ECF No. 15, 16; Spelman Decl. Ex. B.

On November 18, 2022, counsel for the Chase defendants alerted Plaintiff Turner's counsel to the existence of the Arbitration Agreement and Chase's intent to move to compel individual arbitration. *See* Spelman Decl. Ex. C.

On January 9, 2023, Plaintiff Turner amended her complaint to remove the Chase entities as defendants but retained the same underlying factual allegations regarding Chase. ECF No. 19. Specifically, both the initial and amended complaint alleged that Plaintiff Turner "is a Chase Bank customer" who "has called Chase Bank's Contact Center several times," and that she "reasonably

expected her conversation with Chase Bank to be confidential and only between Plaintiff Turner and Chase Bank." *Compare* ECF No. 19 ¶¶ 35–37 *with* ECF No. 1 ¶¶ 38–40. The initial and amended complaint also alleged that "Chase Bank fails to pursue or obtain consent—written or otherwise—from Contact Center callers, prior to allowing Microsoft and Nuance to record, examine, intercept, collect, and analyze consumer's voice prints and/or other voice stress patterns and the content of their confidential conversations with Chase Bank." *Compare* ECF No. 19 ¶¶ 32–33 *with* ECF No. 1 ¶¶ 35–36. Based on these allegations, both complaints asserted claims for alleged violations of CIPA Sections 631(a), 632, and 637.3 on behalf of a putative class of California residents and a putative subclass of California Chase customers. *Compare* ECF No. 19 ¶¶ 46–47, 55–86 *with* ECF No. 1 ¶¶ 49–50, 58–90.

Several months after the *Turner* action was filed, Plaintiffs Smith and Youshei filed yet another substantially similar lawsuit against Nuance in the Superior Court of California, County of Alameda, which Nuance removed to this Court. In their initial complaint, Plaintiffs Smith and Youshei (like Plaintiff Turner) alleged that when they called Chase's customer support, Nuance "examined and recorded their voice prints or voice stress patterns to determine the truth or falsity of their statements" without first obtaining consent from Plaintiffs. *Id*. ¶¶ 54–55. And, as in *Turner*, the *Smith* Plaintiffs asserted claims against Nuance on behalf of a class of California residents for alleged violations of CIPA Section 637.3.

On May 31, 2023, this Court consolidated the *Turner* and *Smith* actions, and on June 14, 2023, Plaintiffs filed a consolidated amended complaint, naming Nuance as the sole defendant. ECF No. 34. The consolidated complaint contains substantially similar allegations to Plaintiffs' prior complaints. Specifically, Plaintiffs allege that Nuance is "a tool intended to be integrated into the call centers of companies that have licensed Nuance's software," "including Chase Bank," which "use Nuance's biometric voice recognition software to verify their callers' identities." CAC ¶ 27. Plaintiffs allege further that "businesses seek to authenticate the identities of their customers dialing into their call centers . . . to determine whether the caller is telling the truth when identifying themselves and attempting to gain access to their customer account," and those "[b]usinesses can

partner with Nuance, and thus allow Nuance to have access to conversations made through the business's call centers," so that "Nuance can verify a consumer's identity and determine whether the consumer is who they purport to be." *Id*. ¶¶ 4–5. Plaintiffs each allege that they have "called Chase's customer support call center" on at least "multiple occasions," and that "when [they] called Chase Bank's Contact Center, [their] telephone was tapped by Nuance using Gatekeeper's voice biometric security solution" even though they "did not give [their] consent, written or otherwise, to either Nuance or Chase." *Id*. ¶¶ 44, 47, 50, 54, 56, 59, 63, 65, 68.

Plaintiffs claim that this application by Chase of Nuance's software violates CIPA Sections 631, 632, and 637.3 because, according to them "[n]either Nuance nor its call center customers inform the consumer" that Nuance is "listening in" and allegedly "record[ing]" and "analyz[ing]" their "confidential communications with companies such as Chase Bank." *Id*. ¶ 41; *see also id.* ¶ 37 (alleging "Nuance's software seamlessly incorporates into its customers' call centers, without adequate notice (or any at all) that Nuance (a third-party) is even involved in the call"). Plaintiffs assert these claims against Nuance on behalf of a putative class of California residents "who had their voice prints, voice stress patterns, or other elements of their conversation recorded and examined by Nuance without first obtaining prior written consent." *Id*. ¶ 72.[2]

## III. ARGUMENT

### A. Under the FAA, Courts Enforce Valid Agreements to Arbitrate.

The FAA provides that a binding arbitration agreement in a contract "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The FAA applies to any written arbitration agreement contained in a contract "evidencing a transaction involving commerce." *Id*. The Supreme Court

[2] Other cases have been filed solely against Nuance customers (and not Nuance) based on alleged violations of § 637.3 of CIPA alleging arising out of customer use of Nuance voice authentication software. In one of those cases, *Balanzar v. Fid. Brokerage Servs., LLC*, No. 22-CV-1372-GPC, 2023 WL 1767011, at *1 (S.D. Cal. Feb. 3, 2023), the district court granted the customer's motion to dismiss, and plaintiff's counsel in that case thereafter voluntarily dismissed all of their other CIPA cases against Nuance customers. *See Smith v. TD Bank, N.A.*, No. 3:22-cv-01370 (S.D. Cal.); *Laughead v. The Charles Schwab Corp.*, No. 3:22-cv-01498 (S.D. Cal.); *Melchor et al. v. Capital One Bank (USA) N.A.*, No. 3:22-cv-01371 (S.D. Cal.); *Moore, Jr. v. T. Rowe Price Retirement Services, Inc.*, No. 22-cv-1673 (S.D. Cal.); *Ortiz v. Vanguard Marketing Corp.*, No. 3:22-cv-01685 (S.D. Cal.). In light of those dismissals, Nuance requested that Plaintiffs here dismiss their alleged claims under CIPA § 637.3, but Plaintiffs refused.

has expansively construed the phrase "involving commerce" as extending the FAA's reach to the full limit of Congress's Commerce Clause power. *See Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 268 (1995). Courts have also held that the FAA governs arbitration agreements that expressly provide for its application. *Victrola 89, LLC v. Jaman Properties 8 LLC*, 46 Cal. App. 5th 337, 346 (2020) ("It follows that when an agreement provides that its 'enforcement' shall be governed by the FAA, the FAA governs a party's motion to compel arbitration."); *see also Prima Donna Dev. Corp. v. Wells Fargo Bank, N.A.*, 42 Cal. App. 5th 22, 35 (2019) (noting that the FAA governed a contract that stated, "[a]ny arbitration proceeding will . . . be governed by the Federal Arbitration Act.").

The Supreme Court and the Ninth Circuit have consistently reaffirmed that arbitration is favored, and arbitration agreements governed by the FAA must be enforced according to their terms. *See, e.g., Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1632 (2018); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011); *Capriole v. Uber Techs., Inc.*, 7 F.4th 854, 861 (9th Cir. 2021). In fact, the liberal federal policy supporting arbitration agreements creates a strong presumption favoring enforcement and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses J. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

Under the FAA, arbitration must be compelled where: (1) a valid agreement to arbitrate exists; and (2) the agreement encompasses the claims at issue. *See Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). As this Court has explained, "[t]he standard for demonstrating arbitrability is not a high one; in fact, a district court has little discretion to deny an arbitration motion, since the [FAA] is phrased in mandatory terms." *Akar v. Prescott Hotel*, No. 07-4531, 2008 WL 2265184, at *2 (N.D. Cal. June 2, 2008) (citing *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 475, 477–78 (9th Cir. 1991)). Moreover, an arbitration agreement governed by the FAA is presumed valid and enforceable, *see Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226–227 (1987), and the party contesting arbitration bears

the burden of showing that the arbitration agreement is invalid or does not encompass the claims at issue. *See Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 92 (2000).

Here, the FAA applies because the Arbitration Agreements expressly provide that they are "entered into pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1–16." Deck Decl. Ex. A at 24; *accord id.* Ex. D at 25 (same); *id.* Ex. E at 25 (same). The FAA also applies because the Arbitration Agreements are contracts between citizens of different states and thus "evidence[es] a transaction involving commerce"[3]: each Plaintiff is a citizen of California, and Chase is a national banking association with its main office in New York, New York. ECF No. 1 ¶ 13. Thus, the Arbitration Agreement is presumed valid and enforceable under the FAA.

This Court should reject Plaintiffs' attempt to dodge enforcement of their agreements to individually arbitrate their alleged claims. As Nuance shows below: (i) each Plaintiff affirmatively assented to the terms of the Deposit Account Agreements, including the obligation to arbitrate disputes on an individual basis, and did not opt out of that arbitration agreement; (ii) each Plaintiff's claims—which are based entirely on interactions with the Chase customer service center and Chase voice authentication—fall within the scope of the broad Arbitration Agreements; and (iii) this Court should enforce the Arbitration Agreements in this case under the doctrine of equitable estoppel.

### B. The Arbitration Agreements Are Valid.

While the FAA governs the enforceability of the Arbitration Agreements according to their terms, state law governs the determination of whether a valid agreement to arbitrate exists. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." (citation omitted)); *Sovak v. Chugai Pharm. Co.*, 280 F.3d 1266, 1270 (9th Cir. 2002) (holding that, where the underlying agreement provided for the application of Illinois law, "we must conclude that the

---

[3] *See, e.g.*, *Orozco v. Gruma Corp.*, No. 20-1290, 2021 WL 4481061, at *7 (E.D. Cal. Sept. 30, 2021) ("[W]here the parties assenting to this contract are of diverse citizenship, their contract necessarily involve[es] interstate commerce.") (citation and internal quotation marks omitted).

Agreement incorporates the FAA's rules for arbitration, but Illinois substantive law applies in all other respects"). The Deposit Account Agreements are governed by "the law of the state where [Plaintiff's] account is located," *i.e.*, "the state where [Plaintiff] applied [for the account,]" if the account was opened in person or, if the account was opened digitally, the state in which [Plaintiff's] address in Chase's records is located, provided that Chase had a branch in the state at the time. Deck Decl. Ex. A at 21. Plaintiffs' Chase accounts all are located in California. *See* Deck Decl. ¶¶ 4 and 6; Kwait Decl. ¶ 3. California law therefore governs whether a valid arbitration agreement exists.

Under California law, "[g]eneral principles of contract law determine whether the parties have entered a binding agreement to arbitrate." *Pinnacle Museum Tower Assn. v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal. 4th 223, 236 (2012) (citation omitted). "There is no contract until there is mutual consent of the parties[,]" which "is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." *Molina v. Scandinavian Designs, Inc.*, No. 13-4256, 2014 WL 1615177, at *3 (N.D. Cal. Apr. 21, 2014) (citing *Deleon v. Verizon Wireless, LLC*, 207 Cal. App. 4th 800, 813 (2012)). "Ordinarily, one who accepts or signs an instrument, which on its face is a contract, is deemed to assent to all its terms." *Id.*

Here, Chase's records confirm that Plaintiffs are all Chase customers. Moore Decl. ¶¶ 3–5; Deck Decl. ¶¶ 2, 4, 6. As Chase customers, Plaintiffs were each presented with the Deposit Account Agreement governing their accounts when they opened the accounts, and they each executed a signature card for their accounts, thereby acknowledging receipt of the Chase Deposit Account Agreements and agreeing to be bound by the terms and conditions contained therein. Moore Decl. ¶ 10; *see also* Kwait Decl. ¶¶ 4–8. Plaintiffs are therefore "deemed to assent to all [the] terms" of the Deposit Account Agreements. *Molina*, 2014 WL 1615177, at *3. Moreover, none of the Plaintiffs opted out of the Arbitration Agreements. Garrett Decl. ¶ 4. Each Plaintiff thus is bound by the Arbitration Agreements. *See Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1211 (9th Cir. 2016) (holding that arbitration agreement was enforceable under California law

where party had the opportunity to opt out of arbitration); *Circuit City Stores, Inc. v. Ahmed*, 283 F.3d 1198, 1199 (9th Cir. 2002) (same).

These facts are indistinguishable from those in *Johnson v. JPMorgan Chase Bank, N.A.*, where the court concluded that a valid agreement to arbitrate existed where the plaintiffs did not dispute that they signed a signature card when opening their Chase bank accounts, and the operative Deposit Account Agreement contained an arbitration provision substantively identical to the one at issue here. No. 17-2477, 2018 WL 4726042, at *3–*8 (C.D. Cal. Sept. 18, 2018); *see also Sanchez v. J.P. Morgan Chase Bank, N.A.*, No. 14-20468, 2014 WL 4063046, at *3 (S.D. Fla. Aug. 15, 2014) ("[B]ecause each Plaintiff received the Deposit Account Agreement and did not opt out of its arbitration requirement, the Court determines that each of the Plaintiffs agreed to the arbitration requirement in the Deposit Account Agreement."). The same result should follow here.

### C. Plaintiffs' Claims Are Within The Scope Of The Arbitration Agreements.

An "order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Techs., Inc. v. Comm'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (citation omitted). Where the scope of matters to be arbitrated is broad, as in the Arbitration Agreement at issue here, and there is no "express provision excluding a particular grievance from arbitration," the Supreme Court has held that "only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *Id*. (citation omitted).[4]

[4] This Court may decide scope of the arbitration agreement. *See, e.g.*, *Portland GE v. Liberty Mut. Ins. Co.*, 862 F.3d 981, 985 (9th Cir. 2017). But even if there were any doubt, the Court should compel Plaintiffs to arbitrate any question of arbitrability, including scope, to the arbitrator, as the Arbitration Agreement expressly incorporates the JAMS or AAA rules, thereby expressly delegating questions of arbitrability (including scope) to the arbitrator. S*ee, e.g.*, Deck Decl. Ex. A at 25; JAMS Streamlined Arbitration Rules, available at: https://www.jamsadr.com/rules-streamlined-arbitration/#Rule-8; American Arbitration Association Consumer Arbitration Rules, available at: https://www.adr.org/sites/default/files/Consumer-Rules-Web_0.pdf. *See Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (holding that "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability"); *Cooper v. Adobe Sys. Inc.*, No. 18-CV-06742, 2019 WL 5102609, at *6 (N.D. Cal. Oct. 11, 2019) ("Incorporation of arbitration rules, such as the JAMS rules, constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability.").

Here, the Arbitration Agreement broadly provides that "[c]laims or disputes between you and us about your deposit account, transactions involving your deposit account, . . . and *any related service or agreement with us* are subject to arbitration. Any claims or disputes arising from or relating to this agreement . . . are also included. Claims are subject to arbitration, regardless of what theory they are based on or whether they seek legal or equitable remedies. Arbitration applies to any and all such claims or disputes, whether they arose in the past, may currently exist or may arise in the future." Deck Decl. Ex. A at 24 (emphasis added); *accord id.* Ex. D at 25; *id.* Ex. E at 25. Plaintiffs' claims are based entirely on calls they allegedly made to the Chase customer service center about their accounts and their interactions with Chase voice authentication. *See* CAC ¶¶ 44–50; 54–59; 63–68. Plaintiffs' claims thus relate to or arise from their Chase accounts, transactions involving their accounts, their Deposit Account Agreements (*see* Deck Decl. Ex. A at 10 ("You may use our automated customer service system or speak to us to get your account information, transfer funds between your accounts with us, or pay qualifying Chase loans or credit cards."); *id.* Ex. A at 19 (Chase "may record and/or monitor any of our telephone conversations with you" and "may use your voice to verify your identity")), and/or the "related services" that Chase provides (such as voice authentication) in connection with Plaintiffs' accounts. *See id.*

The plain language of the Arbitration Agreement therefore encompasses Plaintiffs' claims—as Plaintiff Turner herself effectively recognized in originally asserting these claims against Chase as well, dropping Chase only upon realizing her arbitration agreement with Chase would unquestionably apply to these claims and that Chase intended to move to compel arbitration. *See* Spelman Decl. Ex. C. Indeed, courts have consistently held the broad "any claims" provision in Chase's Deposit Account Agreement applies to claims based on plaintiffs' interactions and communications with Chase. *See Dill v. JPMorgan Chase Bank, N.A.*, No. 19-10947, 2020 WL 4345755, at *8 (S.D.N.Y. July 29, 2020) (compelling arbitration of claims pursuant to Chase's Deposit Account Agreement, substantively identical to the one at issue here, and concluding that the "broad [arbitration] agreement covers all claims and disputes about Plaintiffs' deposit accounts, transactions involving their deposit accounts, and any related services with Defendant"); *see also*

*Sunmonu v. Chase Bank, N.A.*, No. 18-CV-1695, 2019 WL 1258788, at *2 (D. Md. Mar. 19, 2019) (noting that the dispute "fit[] within [the] broad language of the Deposit Account Agreement); *Johnson*, 2018 WL 4726042, at *8 ("Under the plain language of the Arbitration Provision [in Chase's Deposit Account Agreement], any dispute relating to Plaintiffs' accounts must be resolved through arbitration."); *Novak v. JP Morgan Chase Bank, NA*, No. 06-CV-14862, 2008 WL 907380, at *8–9 (E.D. Mich. Mar. 31, 2008) (compelling arbitration under Deposit Account Agreement and holding that the agreement contained "a broad arbitration clause").

**D. This Court Should Enforce Plaintiffs' Agreements To Individually Arbitrate Their Alleged Claims Under The Doctrine Of Equitable Estoppel.**

Under California law, equitable estoppel permits a non-signatory to an arbitration agreement to compel a signatory to arbitrate "in two scenarios: (1) when a signatory must rely on the terms of the written agreement in asserting its claims against the nonsignatory or the claims are intimately founded in and intertwined with the underlying contract, and (2) when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and the allegations of interdependent misconduct [are] founded in or intimately connected with the obligations of the underlying agreement." *In re Pac. Fertility Ctr. Litig.*, 814 F. App'x 206, 208–09 (9th Cir. 2020) (internal quotations and citations omitted). Courts in this district consistently compel individual arbitration when either of these equitable estoppel grounds is met. *See, e.g.*, *Mance v. Mercedes-Benz USA*, 901 F. Supp. 2d 1147 (N.D. Cal. 2012); *Russell v. BMW of N. Am., LLC*, No. 22-3299, 2022 WL 18674435, at *5 (C.D. Cal. Oct. 14, 2022).

Both scenarios exist here, and this Court should compel Plaintiffs to individually arbitrate their claims against Nuance.

**1. Plaintiffs' claims are "intimately founded in and intertwined with" the Deposit Account Agreements.**

In determining whether a plaintiff's allegations and an arbitration agreement are intertwined for purposes of applying equitable estoppel, courts look to whether the substance of the claims are rooted in the relationship governed by the contract. *E.g.*, *Franklin v. Cmty. Reg'l*

*Med. Ctr.*, 998 F.3d 867, 875 (9th Cir. 2021); *Mance*, 901 F. Supp. 2d at 1156. For example, in *Franklin*, the plaintiff entered into an arbitration agreement with a staffing agency and was assigned to work for the agency's client, a hospital, which was a non-signatory to the arbitration agreement. 998 F.3d at 869–70. After disputes about her employment arose, the plaintiff sued only the hospital, alleging violations of the California Labor Code and other laws based on the hospital's alleged failure to give proper meal breaks, pay for off-the-clock work, provide accurate wage statements, or reimburse for expenses she incurred during her orientation. *Id*. at 874–75.

The Ninth Circuit held that the hospital was entitled to compel arbitration under the plaintiff's arbitration agreement with the staffing agency. The Court observed that the plaintiff's relationship with the staffing agency was "central" to her claims against the hospital:

> We analyze Franklin's claims by looking at the relationship between the parties and their connection to the alleged violations. In doing so, we find that Franklin's employment with [the staffing agency] is central to her claims. . . . Although Franklin omits any mention of [the staffing agency] from her complaint, the substance of her claims is rooted in her employment relationship with [the staffing agency], which is governed by the Arbitration Agreement.

*Id.* at 875 (citations omitted). The Court also noted that "[i]n matters of equity, such as the application of equitable estoppel, it is the substance of the plaintiff's claim that counts, not the form of its pleading." *Id*. The Court therefore concluded that the plaintiff was equitably estopped from avoiding arbitration of her claims against the hospital. *Id.* at 876.

The Northern District of California applied a similar rationale in *Mance*, where the plaintiff purchased a Mercedes-Benz automobile from a Mercedes-Benz dealer and signed a "Retail Installment Contract" with the dealer, which contained an arbitration clause. 901 F. Supp. 2d at 1157. After several unsuccessful attempts to have his car repaired, the plaintiff sued Mercedes-Benz USA, but not the dealer, for breach of express and implied warranty and violation of the California "Lemon Law." *Id*. at 1153. Mercedes-Benz USA argued that the plaintiff should be compelled to arbitrate his claims under a theory of equitable estoppel, and the court agreed. *Id*. at 1157.

The court noted that the plaintiff's claims "ma[de] reference to or presume[ed] the existence of" the Retail Installment Contract because "Mercedes–Benz's duty to comply with its warranty arose only when Mr. Mance bought the car. Had he not signed the contract, he would not have received the warranty from Mercedes–Benz. In other words, his claim for breach of warranty is premised on, and arises out of, the contract." *Id*. at 1157. Numerous other courts have held similarly. *See Russell*, 2022 WL 18674435, at *6; *Turtle Ridge Media Grp., Inc. v. Pac. Bell Directory*, 140 Cal. App. 4th 828, 833 (2006), *as modified* (July 20, 2006) (holding nonsignatory could compel arbitration under equitable estoppel because signatory's claims against nonsignatory were "legally intertwined" with the agreement that contained an arbitration clause).[5]

Here, as in *Franklin*, *Mance*, *Russell*, and *Turtle Ridge*, Plaintiffs' claims are intertwined with the Deposit Account Agreements, which provided Plaintiffs access to the Chase customer service center and the Chase voice authentication that forms the basis of their claims, and even informed them that Chase would use such software. *See* Deck Decl. Ex. A at 1, 10, 19, and 22; *id.* Ex. B. at 22 & 34; *id.* Ex. C at 22 & 31.

As the court observed in *Boucher v. All. Title Co*., 127 Cal. App. 4th 262, 272 (2005), "[t]he fundamental point [of equitable estoppel] is that a party may not make use of a contract containing an arbitration clause and then attempt to avoid the duty to arbitrate by defining the forum in which the dispute will be resolved." Yet that is precisely what Plaintiffs are attempting to do here: they have "ma[d]e use of" the benefits of the Deposit Account Agreements—including the Chase customer service center and Chase voice authentication central to this case—and now seek to "avoid the duty to arbitrate" by strategically excluding Chase from the consolidated amended complaint. Plaintiffs should not be permitted to "play[] fast and loose with [their]

---

[5] *Kramer v. Toyota Motor Corp*., 705 F.3d 1122 (9th Cir. 2013), which preceded *Franklin*, and *Ngo v. BMW of N. Am., LLC*, 23 F.4th 942 (9th Cir. 2022), are both inapposite because the purchase agreements at issue in those cases "expressly differentiate[d] dealer warranties from manufacturer warranties," and thus the claims against the non-signatory manufacturer arose "independently from the Purchase Agreements." *Kramer*, 705 F.3d at 1131; *Ngo*, 23 F.4th at 950 (same). Here, to the contrary, Plaintiffs' alleged claims arise from and are intertwined with the Chase voice authentication service that is specifically addressed (and to which Plaintiffs agreed) in the Deposit Account Agreements. *See* Deck Decl. Ex. A at 19 (Chase "may record and/or monitor any of our telephone conversations with you" and "may use your voice to verify your identity.").

commitment to arbitrate" their claims. *Metalclad Corp v. Ventana Environmental Org. P'ship*, 109 Cal. App. 4th 1705, 1714 (2003) (citing *IDS Life Ins. Co. v. SunAmerica, Inc*., 103 F.3d 524, 530 (7th Cir. 1996)). Because Plaintiffs' claims against Nuance are intertwined with the Deposit Account Agreements, the equitable estoppel doctrine applies and the Court may compel Plaintiffs to individual arbitration on this basis, alone.

**2. Plaintiffs allege substantially interdependent and concerted misconduct by Chase and Nuance, and their allegations are connected with the obligations of the Deposit Account Agreements.**

The equitable estoppel doctrine also applies to require Plaintiffs to individually arbitrate their claims against Nuance because they rest their claims on alleged wrongdoing by both the signatory (Chase) and the non-signatory (Nuance), and their allegations are founded in or intimately connected with the obligations in the underlying Deposit Account Agreements. This provides an independent basis on which to compel Plaintiffs to individual arbitration.

The Ninth Circuit's decision in *Pac. Fertility Ctr*. is illustrative. There, the plaintiffs filed suit against Pacific Fertility Center, Chart Industries, Inc. (an egg and embryo storage tank company), Pacific MSO, LLC (Pacific Facility Center's parent company), and Prelude Fertility, Inc. (a subsidiary of Pacific MSO) after the liquid nitrogen levels in a cryopreservation tank storing their eggs and embryos dropped to an unsafe level for an undetermined period, causing potential damage. 814 F. App'x at 208. The plaintiffs signed Informed Consent Agreements ("ICAs") with Pacific Fertility Center, each of which contained an arbitration provision. *Id*. The three non-signatory companies – Chart, Pacific MSO, and Prelude – moved to compel arbitration under the ICAs based on a theory of equitable estoppel. *Id*. The district court denied their motions, and the companies appealed.

The Ninth Circuit reversed as to Pacific MSO and Prelude, determining that they could compel the plaintiffs to arbitrate their claims. *Id*. In so holding, the Court examined the plaintiffs' claims against Pacific MSO and Prelude and concluded that, even though the claims did not

expressly mention the ICAs, they were nonetheless founded in the agreements and intertwined with the conduct of the other signatory, Pacific Facility Center ("PFC"):

> Underlying each claim are allegations about PFC's conduct, not just Prelude and MSO's. And Plaintiffs' allegations concerning their expectations about the service PFC provided—then imputed onto Prelude and MSO—are exactly the terms and duties of the ICA. Even though Plaintiffs do not mention the ICA, the claims they raise against Prelude and MSO are founded in and inextricably intertwined with the terms and obligations of the ICA.

*Id*. at 209. The Court thus concluded that Pacific MSO and Prelude could invoke equitable estoppel to compel the plaintiffs to arbitrate their claims. On the other hand, Chart could not invoke equitable estoppel because the claims against Chart (for failure to recall and adequately design the storage tanks at issue) were entirely independent from the terms of the ICAs with PFC, and "Plaintiffs also do not allege collusion between Chart and the other defendants." *Id*.[6]

The claims against Nuance in this litigation are akin to those asserted against Pacific MSO and Prelude, as the "factual allegations underpinning [Plaintiffs'] claims" concern "[Chase's] conduct, not just [Nuance's]," "allege[] collusion" between the two parties, and involve "claims . . . against [Nuance] [that] are founded in and inextricably intertwined with the terms and obligations of the [Deposit Account Agreements]." 814 F. App'x at 209. As noted above, Plaintiffs' claims against Nuance are based on their interactions with Chase's customer service center and Chase voice authentication. *See* CAC ¶¶ 44, 54, 63. Significantly, Plaintiffs describe Nuance's software as a "tool" *used by Chase* during these calls "to authenticate the identities of their customers dialing into their call centers." *Id.* ¶¶ 4, 27. And according to Plaintiffs, liability allegedly arises under the California Invasion of Privacy Act because "neither Nuance *nor* Chase disclosed" to the consumer that Nuance software is deployed during "consumers' confidential communications with Nuance's customers like Chase Bank." *Id.* ¶¶ 50, 59, 68 (emphasis added).

[6] *Goldman v. KPMG, LLP*, 173 Cal. App. 4th 209 (2009) is distinguishable because unlike here, "the contractual obligations in the operating agreements [that required arbitration] were unrelated to the plaintiffs' claims against the nonsignatory accountants and lawyers," and the express written agreement between the plaintiffs and the accountants contained no arbitration provision. *Id*. at 214.

Moreover, as discussed above, Nuance's and Chase's alleged interdependent conduct is "founded in and inextricably intertwined with the terms and obligations of" the Deposit Account Agreements, which provide access to the Chase customer service center and Chase voice authentication on which Plaintiffs base their alleged claims. *See, e.g.*, Deck Decl. Ex. A at 19 (Chase "may record and/or monitor any of our telephone conversations with you" and "may use your voice to verify your identity."). In short, "[e]ven though Plaintiffs do not mention the [Deposit Account Agreements], the claims they raise against [Nuance]" are intimately connected with the terms and obligations of the agreement. *Pac. Fertility Ctr*, 814 F. App'x at 209.

The fact that Plaintiffs have strategically chosen to pursue this action against Nuance, rather than against Chase directly, does not absolve them of the obligation to arbitrate. Indeed, Plaintiff Turner originally included multiple Chase entities as defendants in this action (and in her counsel's abandoned *Chaidez* action). *See* ECF No. 1 and Spelman Decl. Ex. A. And "[w]hile Plaintiff recently dismissed [Chase] as a defendant in the case, the allegations in the complaint against [Chase] and [Defendant] remain the same." *Tyman v. Ford Motor Co.*, 521 F. Supp. 3d 1222, 1227 (S.D. Fla. 2021) (granting motion to compel arbitration against non-signatory on the basis of equitable estoppel). Notably, Plaintiff Turner dismissed Chase *without prejudice*, so Plaintiffs could pursue Chase in arbitration at a later date. This situation is exactly what the doctrine of equitable estoppel seeks to prevent: "[w]here a party to an arbitration agreement attempts to avoid that agreement by suing a related party with which it has no arbitration agreement, in the hope that the claim against the other party will be adjudicated first and have preclusive effect in the arbitration[,] [s]uch a maneuver should not be allowed to succeed[.]" *Franklin*, 998 F.3d at 871 (citing *Metalclad*, 109 Cal. App. 4th at 1714 (2003)) (internal quotations omitted). That rationale requires arbitration here.

## IV. THE ACTION SHOULD BE STAYED PENDING THE OUTCOME OF ARBITRATION.

The FAA expressly provides that, where a valid arbitration agreement requires a dispute to be submitted to binding arbitration, the district court "*shall* . . . stay the trial of the action until such

arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3 (emphasis added); *see also Ziober v. BLB Res., Inc.*, 839 F.3d 814, 817 (9th Cir. 2016). California law also requires that an action "shall" be stayed pending completion of arbitration. Cal. Civ. Proc. Code § 1281.4. Because Plaintiffs' claims are subject to binding individual arbitration, this action should be stayed in its entirety pending completion of arbitration.

## V. CONCLUSION

For the foregoing reasons, Nuance respectfully requests that the Court grant this motion and enter an order: (1) compelling each Plaintiff to individually arbitrate his or her claims against Nuance under the terms of the binding Arbitration Agreements; and (2) staying this action in its entirety under 9 U.S.C. § 3.

Dated: July 31, 2023

JENNER & BLOCK LLP

By: /s/ Kate T. Spelman
Kate T. Spelman
David C. Layden

Attorneys for Defendant
Nuance Communications, Inc.