Neal J. Deckant (SBN 322946)
ndeckant@bursor.com
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
BURSOR AND FISHER, P.A.
Tel: 925-300-4455
Fax: 925-407-2700

Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415-212-9300
Fax: 415-373-9435

Theo Benjamin (*pro hac vice*)
tbenjamin@edelson.com
EDELSON PC
350 N. LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312-572-7212
Fax: 312-589-6378

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| DANA TURNER, DANIEL SMITH, and AARON YOUSHEI, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>*v.*<br><br>NUANCE COMMUNICATIONS, INC., a Delaware corporation,<br><br>*Defendant*. | Case No. 4:22-cv-05827-DMR<br><br>Hon. Donna M. Ryu<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS**<br><br>Date: February 21, 2024<br>Time: 10:00 a.m.<br>Room: Courtroom 4 |

# TABLE OF CONTENTS


PAGE(S)

INTRODUCTION ........ 1

BACKGROUND ........ 3

I. THE CALIFORNIA INVASION OF PRIVACY ACT ("CIPA"). ........ 3

II. PLAINTIFFS' ALLEGATIONS. ........ 4

LEGAL STANDARD ........ 5

ARGUMENT ........ 5

I. PLAINTIFFS DID NOT PROVIDE THEIR CONSENT PRIOR TO NUANCE'S INVASION OF THEIR PRIVACY ........ 5

A. The Statutory Language Requires Actual Consent. ........ 6

B. The Agreements Nuance Relies On Do Not Demonstrate Plaintiffs' Actual Consent. ........ 7

1. The Provisions Nuance Relies On Do Not Create Consent. ........ 7

2. Nuance Has Not Demonstrated That Plaintiffs Were Even On Notice Of These Provisions. ........ 12

II. PLAINTIFFS SUFFICIENTLY ALLEGE A VIOLATION OF CAL. PENAL CODE § 631(a). ........ 13

A. Plaintiffs Sufficiently Allege Defendant Is A Third-Party Wiretapper. ........ 13

1. Defendant Is A Third-Party Wiretapper Under The "Separate Entity" Or "Capability" Approaches. ........ 15

2. The "Extension" Approach Is Contrary To The Alleged Facts, The California Supreme Court's Holding In *Ribas*, And The CIPA's Legislative Purpose, And Should Be Rejected.. ........ 15

B. Defendant Willfully Learned The Content Of Plaintiffs' Communications With Chase In Violation Of The Second Clause Of § 631(a). ........ 20

C. Defendant Used The Wiretapped Communications In Violation Of § 631(a)'s Third Clause. ........ 21

III. PLAINTIFFS SUFFICIENTLY ALLEGE A VIOLATION OF CAL. PENAL CODE § 632 ........ 22

IV. PLAINTIFFS SUFFICIENTLY ALLEGE A VIOLATION OF CAL. PENAL CODE § 637.3 ........ 23

CONCLUSION ........ 25

## TABLE OF AUTHORITIES


PAGE(S)

**CASES**

*Apple Inc. v. Superior Ct.*, 292 P.3d 883 (Cal. 2013) .......... 23

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......... 5

*Augustine v. Lenovo (United States), Inc.*, 2023 WL 4938050 (S.D. Cal. Aug. 2, 2023) .......... 14

*Balanzar v. Fidelity Brokerage Services, LLC*, 654 F. Supp. 3d 1075 (S.D. Cal. 2023) .......... 24

*Balletto v. Am. Honda Motor Co.*, 2023 WL 7026931 (N.D. Cal. Oct. 24, 2023) .......... 19

*Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110 (N.D. Cal. 2020) .......... 20

*Byars v. Hot Topic, Inc.*, 656 F. Supp. 3d 1051 (C.D. Cal. 2023) .......... 18

*Calhoun v. Google LLC*, 526 F. Supp. 3d 605 (N.D. Cal. 2021) .......... 6, 9

*Campbell v. Facebook, Inc.*, 77 F. Supp. 3d 836 (N.D. Cal. 2014) .......... 6, 9

*D'Angelo v. Penny OpCo, LLC d/b/a JCPenney*, 2023 WL 7006793 (S.D. Cal. Oct. 24, 2023) .......... 15, 19

*Doe v. Microsoft Corp.*, 2023 WL 8780879 (W.D. Wash. Dec. 19, 2023) .......... 6

*Flanagan v. Flanagan*, 41 P.3d 575 (Cal. 2002) .......... 3

*Flowers v. Twilio, Inc.*, 2016 WL 11684603 (Cal. Super. Ct. Aug. 2, 2016) .......... 15

*Garcia v. Build.com, Inc.*, 2023 WL 4535531 (S.D. Cal. July 13, 2023) .......... 18

*Garcia v. Yeti Coolers, LLC*, 2023 WL 5736006 (C.D. Cal. Sept. 5, 2023) .......... 16

*Graham v. Noom*,
533 F. Supp. 3d 823 (N.D. Cal. 2021) .......... 18, 19

*In re Facebook, Inc. Internet Tracking Litigation*,
956 F.3d 589 (9th Cir. 2020) .......... 14, 19

*In re Google Assistant Priv. Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) .......... 22

*In re Google Inc.*,
2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) .......... 6, 8

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) .......... 7, 9

*In re Zynga Priv. Litig.*,
750 F.3d 1098 (9th Cir. 2014) .......... 21

*Jackson v. Amazon.com, Inc.*,
65 F.4th 1093 (9th Cir. 2023) .......... 11, 12

*Javier v. Assurance IQ, LLC*,
649 F. Supp. 3d 891 (N.D. Cal. 2023) .......... passim

*Javier v. Assurance IQ, LLC*,
2022 WL 1744107 (9th Cir. May 31, 2022) .......... 3, 6, 12

*Kearney v. Salomon Smith Barney, Inc.*,
137 P.3d 914 (Cal. 2006) .......... 6, 22

*Knutson v. Sirius XM Radio Inc.*,
771 F.3d 559 (9th Cir. 2014) .......... 13

*Licea v. Old Navy, LLC*,
2023 WL 3012527 (C.D. Cal. Apr. 19, 2023) .......... 18

*Lopez v. Apple, Inc.*,
519 F. Supp. 3d 672 (N.D. Cal. 2021) .......... 6

*McCoy v. Alphabet, Inc.*,
2021 WL 405816 (N.D. Cal. Feb. 2, 2021) .......... 7

*Navarro v. Block*,
250 F.3d 729 (9th Cir. 2001) .......... 5

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) .......... 11

*Norcia v. Samsung Telecommunications Am., LLC*,
845 F.3d 1279 (9th Cir. 2017) .......... 12

*Revitch v. New Moosejaw, LLC*,
2019 WL 5485330 (N.D. Cal. Oct. 23, 2019) .......... 15

*Ribas v. Clark*,
696 P.2d 637 (1985) .......... passim

*Rogers v. Ulrich*,
52 Cal. App. 3d 894 (1975) .......... 14

*Roney v. Miller*,
705 F. App'x 670 (9th Cir. 2017) .......... 25

*Saleh v. Nike, Inc.*,
562 F. Supp. 3d 503 (C.D. Cal. 2021) .......... 15

*Satterfield v. Simon & Schuster, Inc.*,
569 F.3d 946 (9th Cir. 2009) .......... 6

*Shroyer v. New Cingular Wireless Servs., Inc.*,
622 F.3d 1035 (9th Cir. 2010) .......... 5

*Silver v. Stripe, Inc.*,
2021 WL 3191752 (N.D. Cal. July 28, 2021) .......... 9

*Smith v. Blue Shield of Cal. Life & Health Ins. Co.*,
228 F. Supp. 3d 1056 (C.D. Cal. 2017) .......... 6, 9

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017) .......... 9

*Smith v. Facebook, Inc.*,
745 F. App'x 8 (9th Cir. 2018) .......... 6

*Smith v. LoanMe, Inc.*,
483 P.3d 869 (Cal. 2021) .......... 3

*Soo v. Lorex Corp.*,
2020 WL 5408117 (N.D. Cal. Sept. 9, 2020) .......... 12

*Stover v. Experian Holdings, Inc.*,
978 F.3d 1082 (9th Cir. 2020) .......... 11

*Tanner v. Acushnet Co.*,
2023 WL 8152104 (C.D. Cal. Nov. 20, 2023) .......... 17

*Tavernetti v. Super. Ct.*,
583 P.2d 737 (Cal. 1978) .......... 13, 16, 20, 21

*Valenzuela v. Nationwide Mutual Ins. Co.*,
2023 WL 5266033 (C.D. Cal. Aug. 14, 2023) .......... 15, 16, 17, 19

*Valenzuela v. Super Bright LEDs Inc.*,
2023 WL 8424472 (C.D. Cal. Nov. 27, 2023) .......... 14, 19

*Weiss v. City of Del Mar*,
39 Cal. App. 5th 609 (2019) .......... 23

*Williams v. What If Holdings, LLC*,
2022 WL 17869275 (N.D. Cal. Dec. 22, 2022) .......... 18

*Wright v. Ulta Salon, Cosmetics & Fragrance, Inc.*,
2023 WL 5837492 (S.D. Cal. Sept. 8, 2023) .......... 17

*Yockey v. Salesforce, Inc.*,
2023 WL 5519323 (N.D. Cal. Aug. 25, 2023) .......... 19

*Yoon v. Lululemon USA, Inc.*,
549 F. Supp. 3d 1073 (C.D. Cal. 2021) .......... 14, 17

**STATUTES**

Cal. Penal Code § 630 .......... 1, 3, 4, 5

Cal. Penal Code § 631 .......... passim

Cal. Penal Code § 632 .......... passim

Cal. Penal Code § 637.3 .......... passim

**INTRODUCTION**

More than fifty years ago, the California Legislature enacted the California Invasion of Privacy Act ("CIPA"), in recognition of the fact that "advances in science and technology" had precipitated the development of new ways to listen in on private conversations. Cal. Penal Code § 630 ¶ 1. Over the years, as the advancement of science and technology has continued apace and led to new and varied ways to invade the privacy of Californians, the Legislature has continued to update the CIPA to address these emerging scenarios, creating an array of protections against various invasions of privacy. *See id.* §§ 630–638.55. Three of those protections are relevant here: the protection against unconsented wiretapping telephone conversations (§ 631), the protection again unconsented interception and recording of conversations concerning confidential or sensitive information (§ 632), and the protection against the unconsented use of any system which analyzes or records voice prints or voice stress patterns to determine the truth or falsity of a statement (§ 637.3).

Defendant Nuance Communications, Inc. ("Nuance") provides proprietary software-as-a-service through which it eavesdrops on conversations with consumers, wiretaps and records their conversations, and functions as an audio-based lie detector by analyzing the acoustical and behavioral features of a person's voice to develop a voice print of that person, which it stores for future use so that the truthfulness of the person's statements may be assessed. This case concerns—but is not limited to—Nuance's work for one of its clients, Chase Bank. Nuance monitors calls placed to a Chase customer service line. Nuance contends that Chase employs its capabilities in service of fraud protection, because Nuance can use the information it gleans from listening in on these conversations to confirm a caller's identity. But Chase does not apprise its customers of Nuance's role in monitoring and recording conversations, or in analyzing their voices, and neither entity attempts to gain consent for Nuance's actions.

Voice analysis software poses serious privacy risks. Voices are highly personal, and voice prints can reveal a surprising amount of information about a person, including a person's mental state and behaviors. If left unchecked, Californians are at risk of unknowingly having their voices analyzed and mined for data by third parties who could then make far-reaching determinations

about their lifestyle, health, and credibility. For these reasons, Californians would reasonably want an opportunity to consent before having their conversations recorded or a voice print created—just as the CIPA guarantees. Regardless of Nuance's statements or the benefits of its service, a bank's selection of security measures does not license its contractors to override statutorily guaranteed privacy rights.

Plaintiffs in this case are Chase customers and each has called Chase Bank several times about their bank accounts. Nuance listened in on these phone calls and created a voice print of each Plaintiff, which it subsequently stored for later analysis. Plaintiffs contend these actions violate Cal. Penal Code §§ 631(a), 632(a), and 637.3. In moving to dismiss, Nuance advances several arguments, but each is unsupported by the facts and the law.

*First*, Nuance argues that Plaintiffs' claims are all precluded because Plaintiffs consented to Nuance's conduct when they opened their bank accounts with Chase. This is inaccurate. Nuance is not a signatory to *any* agreement between Chase and Plaintiffs, Nuance's name is not mentioned even once in the 25-page agreement between Chase and Plaintiffs, and Nuance's involvement was not disclosed to Plaintiffs before its wiretapping. Plaintiffs could not have consented to Nuance's alleged actions, because they did not even know about Nuance's role in their conversations.

*Second*, Nuance argues Plaintiffs' claims under §§ 631 and 632 fail because Nuance was not a true third party wiretapper to Plaintiffs' conversations with Chase, but is more accurately considered an "extension" of Chase itself. This argument is irrelevant to § 632 and fails under the plain language of § 631 and California Supreme Court precedent: one acting at the direction of another to wiretap a conversation is a wiretapper all the same. *Ribas v. Clark*, 696 P.2d 637, 641 (1985); *see also* Cal. Penal Code § 631(a) (prohibiting an entity from, among other things, "employ[ing]" another to wiretap). Nuance also argues that it did not learn the "contents" of the communications between Chase and Plaintiffs, but this argument is defeated by the allegations in the Complaint.

*Finally*, Nuance argues that Plaintiffs' claims under § 637.3 fail because determining whether a customer is telling the truth about their stated identity does not qualify as determining the

truth or falsity of any statement, a contention defeated by both the allegations in the complaint and common sense.

The Court should deny Defendant's Motion to Dismiss.

## BACKGROUND

### I. THE CALIFORNIA INVASION OF PRIVACY ACT ("CIPA").

In 1967, the California Legislature enacted the CIPA, which replaced prior laws permitting the recording of private conversations without consent. CIPA was enacted to protect the right of privacy of Californians in response to serious and increasing threats to the confidentiality of private communications. *See* Cal. Penal Code § 630. The California Supreme Court has made clear that the text of the CIPA should be interpreted in light of these animating purposes. *See*, *e.g.*, *Smith v. LoanMe, Inc.*, 483 P.3d 869, 879 (Cal. 2021) (adopting construction that is "better aligned with [the] aims and declarations" of the legislature when passing the CIPA "than a narrower interpretation would be"); *Flanagan v. Flanagan*, 41 P.3d 575, 580 (Cal. 2002) (adopting construction that "better fulfills the legislative purpose of the Privacy Act by giving greater protection to privacy interests"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *2 (9th Cir. May 31, 2022) ("*Javier I*") ("The California Supreme Court has also emphasized that all CIPA provisions are to be interpreted in light of the broad privacy-protecting statutory purposes of CIPA.").

Three specific provisions of the CIPA are at issue here. *First*, Cal. Penal Code § 631(a) makes it unlawful, by means of any machine, instrument, or contrivance, to "intentionally tap[]" or purposefully intercept, the content of a communication over any "telegraph or telephone wire, line, cable or instrument," or to read or attempt to read or learn the content of any such communications without the consent of all parties to the communication. Cal. Penal Code 631(a) also makes it a violation to "use[] or attempt[] to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained."

*Second*, Cal. Penal Code § 632(a) makes it unlawful to intentionally "use[] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication" without the consent of all parties to a confidential communication.

*Last*, Cal. Penal Code § 637.3(a) makes it unlawful to "use any system which examines or records in any manner voice prints or other voice stress patterns of another person to determine the truth or falsity of statements made by such other person without his or her express written consent."

## II. PLAINTIFFS' ALLEGATIONS.

Defendant Nuance markets and sells a propriety software-as-a-service ("SaaS") called "Gatekeeper" that allows businesses to authenticate their customers' identities with their voices. Dkt. No. 34, Consolidated Amended Compl. ("Compl.") ¶ 1. As a third-party technology provider, Nuance provides voice recognition software-as-a-service,[1] which allows businesses to license and integrate Nuance's existing technology, without needing to build an in-house voice-verification system. *Id*. ¶ 27. Put simply, Nuance provides its customers with a sophisticated lie detector test that individuals calling a Nuance customer are subjected to without realizing it. *Id.* ¶ 2. Nuance's SaaS uses artificial intelligence and deep neural networks to analyze a consumer's distinct voice characteristics to determine whether the person is telling the truth when they identify themselves to a business. *Id.* ¶¶ 2–3, 31. Nuance's SaaS listens to an individual's speech and analyzes the characteristics of that person's unique voice, such as the sound of that person's voice, how they talk, what they say, their pattern of speech, word choice, grammar, and syntax. *Id*. ¶ 2.

A core feature of Nuance's voice recognition solution is that it operates entirely in the background of each phone call. *Id.* ¶ 3. In other words, Nuance has live access to an ongoing call as a consumer is communicating with a business (such as Chase), and Nuance passively records, examines, and analyzes a consumer's voice—all without any notice to the consumer that Nuance is involved at all. *Id.* ¶¶ 3, 37–39. To confirm a consumer's identity, Nuance first records a customer's statements, creates a voice print of the caller, and then examines that voice print to determine whether the caller is telling the truth when identifying themselves to gain access to their customer account. *Id.* ¶ 4. Nuance enrolls consumers into its database of voice prints, which it uses to compare the voice characteristics of later callers against their saved voice prints. *Id.* ¶ 29.

---

[1] Nuance contends that Plaintiffs' allegations that Chase uses "cloud-native Gatekeeper software-as-a-service is not true." Mot. at 4 n.4. But Plaintiffs' allegations are well-founded, and Nuance has offered no discovery, facts, or sworn statements on this point to contradict them.

Businesses, like Chase, who communicate with customers by phone can partner with Nuance and employ Nuance to verify a consumer's identity and determine whether the consumer is who they purport to be. *Id.* ¶¶ 4–5. As a selling point to potential clients, Nuance also provides businesses with access to a trove of its existing voice print data. *Id.* ¶¶ 32–33 ("Nuance's technology can supposedly '[a]uthenticate trusted calls and then check caller voices against a watchlist to immediately alert on known fraudsters.'").

Plaintiffs allege that, in the course of providing verification services, Nuance secretly listened to their telephone communications with Chase, and used a system to examine, record, collect, and analyze their voice prints or other voice stress patterns without their consent, in violation of the California Invasion of Privacy Act. Compl. ¶¶ 44–71; Cal. Penal Code §§ 631, 632, 637.3.

Nuance's motion to dismiss challenges Plaintiffs' claims on statutory grounds.

## LEGAL STANDARD

When reviewing a motion to dismiss for failure to state a claim, the court must accept as true all of the factual allegations contained in the complaint, and construe them in the light most favorable to the plaintiff. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Dismissal is appropriate "only where there is no cognizable legal theory" or there is an absence of "sufficient factual matter to state a facially plausible claim to relief." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citing *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001) and *Iqbal*, 556 U.S. at 677). A claim has facial plausibility when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted).

## ARGUMENT

### I. PLAINTIFFS DID NOT PROVIDE THEIR CONSENT PRIOR TO NUANCE'S INVASION OF THEIR PRIVACY.

Nuance argues Plaintiffs consented to its actions because Plaintiffs opened Chase deposit accounts, thereby agreeing to be bound by the Chase Deposit Account Agreement (the "Chase DAA") and the attached Privacy Notice. Mot. at 7. This is simply not true. The Chase DAA does not mention Nuance even once—let alone the fact that Nuance will record, examine, and create

voice prints of Chase customers. *See generally*, Dkt. No. 50-1, Deck Decl., Ex. A. Accordingly, Nuance has not met its burden to demonstrate Plaintiffs' consent to the wiretapping. *Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 685 (N.D. Cal. 2021) ("The party seeking to establish consent has the burden of proof.").

**A. The Statutory Language Requires Actual Consent.**

CIPA requires that parties to a communication obtain consent before invading Californians' privacy. *Javier I*, 2022 WL 1744107, at *2 (citing *Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914, 930 (Cal. 2006)). The form of that consent varies under the CIPA's different provisions. Both §§ 631(a) and 632(a) require "consent" of all parties before wiretapping or eavesdropping, whereas § 637.3 requires prior "express written consent." Nuance failed to obtain Plaintiffs' consent under either standard.

Courts have further interpreted the CIPA to require "actual" consent.[2] *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 620 (N.D. Cal. 2021) (finding that, for a § 631 claim, consent is either "explicit or implied, but any consent must be actual"); *see also Doe v. Microsoft Corp.*, 2023 WL 8780879, at *6 (W.D. Wash. Dec. 19, 2023) (holding the same under § 632). For consent to be "actual," the disclosures must "explicitly notify" users of the specific practice at issue. *Calhoun*, 526 F. Supp. 3d at 620 (quoting *In re Google Inc.*, 2013 WL 5423918, at *13 (N.D. Cal. Sept. 26, 2013)); *see also Campbell v. Facebook, Inc.*, 77 F. Supp. 3d 836, 847–48 (N.D. Cal. 2014) (same). The standard under § 637.3 is even higher, requiring prior "express written consent." While not defined in the CIPA, "express consent"—much like actual consent—is "[c]onsent that is clearly and unmistakably stated." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009) (citing to BLACK'S LAW DICTIONARY (8th ed. 2004)).[3]

[2] Nuance appears to agree, at least, that some form of consent is required, but otherwise does not analyze consent under any discernable standard. Generally, consent is a fact-bound question. *Smith v. Facebook, Inc.*, 745 F. App'x 8, 8 (9th Cir. 2018) ("In determining consent, courts consider whether the circumstances, considered as a whole, demonstrate that a reasonable person understood that an action would be carried out so that their acquiescence demonstrates knowing authorization.").

[3] In other contexts, California courts have interpreted "express written consent" to "mean[] an agreement, in writing, bearing the signature" of the agreeing party that must include a "clear and conspicuous disclosure informing the person signing ... [they] authorize[]" the conduct. *Smith v. Blue Shield of Cal. Life & Health Ins. Co.*, 228 F. Supp. 3d 1056, 1065 (C.D. Cal. 2017) (defining express written consent in the TCPA context).

In short, what matters is whether a "reasonable user" who viewed the Chase Deposit Account Agreement would have understood that Nuance was eavesdropping on their conversations with Chase, recording their conversations, and analyzing their voices. *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 793 (N.D. Cal. 2022) ("[I]n order to be effective, the consent must be to the particular conduct of the actor, or to substantially the same conduct.") (cleaned up). And "[i]f the contract language at issue is reasonably susceptible to more than one interpretation, with one of those interpretations suggesting consent and another belying it, the Court cannot decide the consent issue in Defendant's favor at the motion to dismiss stage." *McCoy v. Alphabet, Inc.*, 2021 WL 405816, at *6 (N.D. Cal. Feb. 2, 2021).

**B. The Agreements Nuance Relies On Do Not Demonstrate Plaintiffs' Actual Consent.**

The Chase DAA makes it clear that it applies only to Chase and its customers, and Nuance is not a party. *See* ECF No. 50-1, at 10 ("Whether you have a personal or business deposit account, this is the basic agreement between *you and us (JPMorgan Chase Bank, N.A. or 'Chase')*.") (emphasis added). Nuance provides no explanation for how or why a Chase customer might understand Chase's terms "us" and "we" to include not only just Chase and its various employees and departments, but also an entirely separate company that neither appears in nor is even referenced in the agreement. Indeed, as Nuance argued in its Reply to the Motion to Compel Arbitration, "the Deposit Account Agreements expressly state that *Chase* will use Plaintiffs' voices to verify their identities," not a third party like Nuance. ECF No. 40 at 3:16-17 (emphasis added). In sum, the agreements Nuance relies on fail to explicitly notify Chase customers of Nuance's conduct. And, as discussed below, Nuance has also failed to demonstrate that Plaintiffs were even on notice of the ambiguous terms on which they rely.

***1. The Provisions Nuance Relies On Do Not Create Consent.***

Because Nuance is not actually captured in the consent provisions of Chase's terms, it seeks to read itself into a small handful of statements scattered across Chase's DAA and Privacy Policy.[4]

[4] Nuance attaches five different versions of the Chase Deposit Agreement to its motion, including versions each Plaintiff was presented with when they each established a Chase account and two subsequent versions that evidently contain various updates. None of the versions contain any disclosure of Nuance or its actions.

The three clauses Nuance relies on in the Chase DAA include:

- "We may record and/or monitor any of our telephone conversations with you." ECF No. 50-1*,* at 24.
- "We may use your voice to verify your identity." *Id.*
- Chase will disclose "information about your account or the transactions you made … to third parties: ... [a]s permitted by our Privacy Notice." *Id.* at 18.

The sole provision Nuance relies on in the Privacy Notice includes a disclosure that Chase can share "personal information" for Chase's "everyday business purposes – such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus." Dkt. No. 50-1, Deck Decl., Ex. A at 31.

These disconnected sentences cited by Nuance do not establish consent of any kind under the CIPA. *First*, the lines in the Chase DAA establishing that Chase "may record and/or monitor any of our telephone conversations with you" and "may use your voice to verify your identity," fail to disclose that recording and monitoring will be conducted not by Chase, but by an unnamed third entity that would be employed by Chase to intercept the contents of Plaintiffs' private conversations. As such, these provisions are limited by their terms to actions exclusively between Chase and the accountholder, and they provide no notice of Nuance's secret participation in the calls.

*Second*, the statements concerning Chase's ability to share information with third parties for certain limited purposes are of questionable relevance here. As with the other statements cited by Nuance, there is nothing in either statement that would put a reader on notice of *Nuance's* actions. The Chase DAA states only that "information about your account or the transactions you made" might be disclosed; it does not state that the accountholder's biometric information is being shared with or intercepted by outside entities. *Id.* Courts have routinely rejected consent arguments built on similar vague statements that fail to explicitly disclose the conduct at issue and the specific information intercepted, examined, or recorded. *See*, *e.g.*, *In re Google*, 2013 WL 5423918, at *13 (Google did not obtain consent when its policies "did not explicitly notify Plaintiffs that Google would intercept users' emails for the purposes of creating user profiles or providing targeted

advertising."); *Campbell v. Facebook, Inc.*, 77 F. Supp. 3d 836, 847–48 (N.D. Cal. 2014) (same); *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 793 (N.D. Cal. 2022); *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 620 (N.D. Cal. 2021) (same).

The cases Nuance cites cut against its argument. For instance, in *Silver v. Stripe, Inc.*, 2021 WL 3191752 (N.D. Cal. July 28, 2021) the Court dismissed CIPA claims based on disclosures in a privacy policy that were highly specific and disclosed the exact types of data collected. *Id.*, at *2–5 (dismissing CIPA claims because the policy included provisions that "plainly" disclosed defendant could install tracking software, which monitored information like "identifiers, demographic information, commercial information, relevant order information, internet activity, geolocation data, sensory information, and inferences."). Nuance also relies on *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 955 (N.D. Cal. 2017), *aff'd*, 745 F. App'x 8 (9th Cir. 2018). But there, the Court dismissed a CIPA claim against Facebook in part because the plaintiffs admitted that they agreed to several detailed Facebook policies governing third party access to their data.[5] By contrast, the disclosures here are vague, generic, and do not disclose Nuance's conduct at all. Moreover, statements about the type of information Chase might share have nothing to do with unconsented monitoring of telephone conversations or Nuance's creation and storage of voice prints. Indeed, statements about what information Chase might "share" are broadly inapplicable here, because Chase cannot "share" information—like a voice print—that Chase never held in the first place. As alleged, this case does not involve the *sharing* of information, but the fact that Chase granted Nuance access to live phone conversations which allowed Nuance to create voice prints of callers. *See*, *e.g.*, Compl. ¶¶ 3, 4. Expressed more simply: Chase did not transfer Plaintiffs' personal information to Nuance. Instead, Chase gave Nuance the opportunity to capture, analyze, and store that information. Therefore, these statements cannot help Nuance here.

[5] The other case cited by Nuance, *Garcia v. Enterprise Holdings*, Inc., involved a claim under a different provision of CIPA, § 637.6, which prohibits the disclosure of personal information acquired via rideshare programs without prior written consent. 78 F. Supp. 3d 11254 (N.D. Cal. 2015). The Court found that plaintiffs had consented under CIPA to having their personal information shared because they had expressly agreed to a privacy policy through a click-on sign-up link, which disclosed—unlike here—that the personal information at issue would be shared with a third party. *Id.* at 1135–37.

Further, a closer inspection of the language of the Privacy Policy only makes Nuance's argument more unavailing. Should a consumer navigate to the Privacy Policy to inspect what "types of personal information [Chase] collect[s] *and share[s]*," they will learn nothing to suggest that Chase allows a third party to listen in on calls and collect voice print data for the purpose of assessing truthfulness. *See* Dkt. No. 50-1, Deck Decl., Ex. A at 3; *see also* Privacy Notice, Figure 1, *infra* (emphasis added). Indeed, the Privacy Policy gestures in an entirely different direction.

Chase groups itself among "financial companies" that share "personal information"—— including Social Security number, income information, account balances, transaction history, credit history, and payment history——all of which is *financial* in nature. *See* Dkt. No. 50-1, Deck Decl., Ex. A at 31, included as Figure 1 below. Nothing is disclosed about sharing accountholder's biometric information, or any type of information akin to that. Chase also gives reasons why it might share this information—for instance, to process transactions, respond to court orders, advertise its own products, or allow affiliates to market their products—all of which are either essential bank functions, mandatory legal obligations, or marketing functions. *See id.* These are activities a consumer might easily assume any bank has been doing in the last fifty years.

*Privacy Notice*

CHASE

Rev. April 2020

| FACTS | WHAT DOES CHASE DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>▪ Social Security number and income<br>▪ account balances and transaction history<br>▪ credit history and payment history |
| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Chase chooses to share; and whether you can limit this sharing. |

**Figure 1.**

The language in this Privacy Notice is woefully inadequate and does not actually put customers on notice. For instance, the Privacy Notice states "Accounts with a California mailing address are automatically treated as if they have limited the sharing with nonaffiliates." ECF No.

50-1, at 32. The Privacy Notice only discloses that, by default, data is shared with "nonaffiliates to market to you." *Id.* at 31. Otherwise, the Privacy Notice only states that data is disclosed to "affiliates" (which would not include Nuance), to Chase ("for *our* everyday business" or "marketing purposes"), or "joint marketing with other financial companies." *Id*. Given the Privacy Notice does not disclose that information will be shared with nonaffiliates for any purpose other than marketing, and given California consumers are automatically opted out of such data sharing, a reasonable consumer would not read the Chase Deposit Account Agreement or Privacy Notice and understand their information is being shared with a nonaffiliate (Nuance) for voice printing and wiretapping.

Put together, the Privacy Notice paints a picture of a financial company sharing traditional financial information to support traditional banking functions—and Chase actually makes it harder for its customers to infer that information being shared is the consumer's unique and distinct voice characteristics which would be examined by a third party to determine whether the person is telling the truth. Compl. ¶ 2.

Finally, Nuance's argument that Plaintiffs agreed to be bound by future versions of the Chase DAA and Privacy Policy fails because it cannot meet its burden to show mutual assent to non-existent terms. "As the party alleging the existence of a contract, [Nuance] has the burden to prove each element of a valid contract—including mutual assent." *Stover v. Experian Holdings, Inc*., 978 F.3d 1082, 1086 (9th Cir. 2020); *see also Nguyen v. Barnes & Noble Inc*., 763 F.3d 1171, 1176 (9th Cir. 2014) (finding a party must have been provided actual notice of the agreement). Even if the updated agreements *had* contained notice of Nuance's participation and actions, however, Nuance fails to demonstrate how the updated agreements were provided to Plaintiffs—and how they obtained *written* consent pursuant to 637.3. *See Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1101 (9th Cir. 2023) ("For the drivers' continued performance of services to constitute assent to be bound by new 2019 terms, Amazon needed to show that it actually provided notice of those terms. It did not do so.").

### 2. *Nuance Has Not Demonstrated That Plaintiffs Were Even On Notice Of These Provisions.*

It is debatable whether Plaintiffs were even on notice of these terms buried deep in the Chase Deposit Account Agreements. As the Ninth Circuit has held in an analogous context, "an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Norcia v. Samsung Telecommunications Am., LLC*, 845 F.3d 1279, 1290 (9th Cir. 2017); *see also id.* at 1289 (denying motion to compel arbitration because "a reasonable person in Norcia's position would not be on notice that the brochure contained a freestanding obligation outside the scope of the warranty") (cleaned up). Here, Nuance relies on provisions in an agreement pertaining to a banking account, which a reasonable consumer would not understand to also govern a third party's ability to wiretap their communications and voiceprint them. Further, the cited provisions are buried nearly twenty pages into the agreement, and are under a heading entitled "Telephone and Electronic Communications," which does not alert a reasonable consumer that this section involves voice printing or wiretapping. *See Soo v. Lorex Corp.*, 2020 WL 5408117, at *5 (N.D. Cal. Sept. 9, 2020) (denying motion to compel arbitration where "Lorex placed the arbitration agreement under the Warranty's 'State/Provincial Law' section deep in another paragraph addressing other matters"). Accordingly, Plaintiffs were not aware of, and therefore could not have assented to, Nuance's wiretapping and voice printing.

Further, the Privacy Notice attached to the Chase DAA notes that "[i]f you are a *new* customer, we can begin sharing your information 30 days from the date we sent this notice." ECF No. 50-1, at 31 (emphasis in original). In other words, the Privacy Notice that Nuance relies on is not included with the Chase Deposit Account Agreement at the time of signature, it must be sent separately. This, of course, would not disclose or provide consent for any sort of wiretapping that occurred *prior* to Chase sending the Privacy Notice. *Javier I*, 2022 WL 1744107, at *2. But Nuance has also not submitted any evidence that the Privacy Notice was sent, much less received, by any Plaintiff. Instead, Nuance submits a declaration that states the various accounts were "governed by a Deposit Account Agreement." *See* ECF No. 50-1 ¶¶ 2-13. Without evidence that Chase sent the Privacy Notice to Plaintiffs, much less that Plaintiffs received the Privacy Notice, Nuance cannot

claim Plaintiffs were on notice of and consented to the same. *See Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1099 (9th Cir. 2023) (denying motion to compel arbitration where "Amazon did not … make any showing that Jackson received [] notice" of updated terms); *see also Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 566 (9th Cir. 2014) ("Nothing in the record, however, indicates that Sirius XM's offer was clearly and effectively communicated to Knutson by mailing him the Customer Agreement.").

For these reasons, Defendant's argument that Plaintiffs' claims are barred fails.

## II. PLAINTIFFS SUFFICIENTLY ALLEGE A VIOLATION OF CAL. PENAL CODE § 631(a).

Next up are the merits of Plaintiffs' claims under CIPA § 631. Plaintiffs bring claims under "three distinct and mutually independent patterns of conduct: [1] intentional wiretapping, [2] willfully attempting to learn the contents or meaning of a communication in transit over a wire, and [3] attempting to use or communicate information obtained as a result of engaging in either of the previous two activities." *Tavernetti v. Super. Ct.*, 583 P.2d 737, 741 (Cal. 1978).

To sidestep liability under § 631 (as well as, Plaintiffs explain below, § 632), Nuance first contends Plaintiffs' claims fail, as a matter of law, because wiretapping under § 631 can only be done by a third party, and that it is instead merely a "tool" or "extension" of Chase, rather than a third party. Mot. at 9–10. Second, Nuance argues that it did not learn the "contents" of the communications between Chase and Plaintiffs. Neither argument persuades.

### A. Plaintiffs Sufficiently Allege Defendant Is A Third-Party Wiretapper.

With respect to Nuance's argument that it is not a *third* party capable of eavesdropping, two basic principles of § 631 are implicated. *First*, if a person listens into a conversation at the time it occurs—even at the direction of one of the parties—that person is liable under § 631. *See Ribas*, 696 P.2d at 641; *see also* Cal. Penal Code § 631(a) (prohibiting a person from "aid[ing], agree[ing] with, [or] employ[ing] … with any person or persons to" conduct wiretapping). In *Ribas*, a California Supreme Court decision which goes unmentioned in Nuance's motion, a conversation between a wife and husband, Ribas, was eavesdropped on by the wife's friend, Clark. There were no allegations that Clark used the wiretapped information for her own benefit, only that Clark

listened in on a conversation to which she was not a party, at the direction of and for the benefit of the wife. Nonetheless, the Court found Clark was a third party wiretapper under § 631(a). *Id.* at 641. Indeed, *Ribas* went as far as to contemplate liability under § 631 for an employer who "*request[s] a secretary to secretly transcribe a conversation over an extension*," even though the secretary's recording was for the sole benefit of their employer. *Id.* (emphasis added).

*Second*, § 631 exempts from liability a person who is a "party" to a communication. *See Rogers v. Ulrich*, 52 Cal. App. 3d 894 (1975); *see also In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 607 (9th Cir. 2020). In *Rogers*, the California Court of Appeal held that the plaintiff could not recover damages under § 631 after an acquaintance recorded a conversation using a tape-recording device without the plaintiff's consent and thereafter shared the conversation with others. *Id.* at 898–99. The Court reasoned that when one party to the conversation uses a tool to record the other party to the conversation, § 631(a) is not violated because wiretapping or eavesdropping requires a third party. *Id.* at 899 ("It is never a secret to one party to a conversation that the other party is listening to the conversation; only a third party can listen secretly to a private conversation.").

The question presented by Nuance's motion is whether Nuance is an independent third party (as Plaintiffs would have it), or merely a passive tool used by Chase (as Nuance urges). *See Valenzuela v. Super Bright LEDs Inc.*, 2023 WL 8424472, at *4-6 (C.D. Cal. Nov. 27, 2023). As an initial matter, this is a "question of fact for a jury, best answered after discovery into the storage mechanics of [Nuance]." *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1081 (C.D. Cal. 2021); *see also Augustine v. Lenovo (United States), Inc.*, 2023 WL 4938050, at *3 (S.D. Cal. Aug. 2, 2023) (same).

Regardless, Nuance's position must fail, at least at this stage, for two reasons. *First*, as the Complaint makes clear, Nuance is far from a passive tool. Nuance provides a cutting-edge software-as-a-service performing advanced voice analysis during live calls, which it offers to paying clients like Chase. Compl. ¶¶ 1, 28. Indeed, rather than being a device that Chase uses to record its customers, Nuance *itself* records and does active analysis of phone calls, and can make use of the data it obtains for its own purposes. *Id.* ¶¶ 5, 28-32 (alleging "[i]n recording and creating

consumer voice prints, Nuance has also amassed a massive voiceprint database of individuals"). Under the facts alleged, Nuance is more like the secretary in *Ribas*. *Id.* ¶ 39; *see also Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021) (finding SaaS provider is a third party wiretapper because it "is a separate legal entity that offers 'software-as-a-service' and not merely a passive device").

*Second*, the narrow line of cases supporting Nuance's position (that providers of software as a service are mere tools employed by parties to a call) are poorly reasoned, and conflict with California Supreme Court authority and the text and purposes of the CIPA itself. The better approach—and one adopted by a growing numbers of courts—is to simply ask whether the SaaS provider is a "separate legal entity" (*Saleh*, 562 F. Supp. 3d at 520) or "ha[s] the *capability* to use its record of the interaction for any other purpose ([unlike] a tape recorder [which] has no independent capability to divulge the recording for any other purpose but that of its owner)." *Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023) ("*Javier II*") (emphasis in original). As to the latter, courts have reasoned that where the SaaS provider is capable of real time *analysis*, meaning some ability to allow an unannounced third party to process or draw conclusions from data in real time, it is a third-party wiretapper. *Id.* (SaaS provider was a third party where "Javier pleads that ActiveProspect monitors, analyzes, and stores information about visits to Assurance's websites"). In either case, Nuance's conduct fits within these parameters.

***1. Defendant Is A Third-Party Wiretapper Under The "Separate Entity" Or "Capability" Approaches.***

As noted above, courts applying § 631 to SaaS providers like Nuance have reasoned that SaaS providers who are "separate legal entit[ies] that offer[] 'software-as-a-service' and not merely a passive device" are third-party wiretappers. *Saleh*, 562 F. Supp. 3d at 520. The logic of this approach draws from the *Ribas* line of cases, which hold that separate corporate entities providing software services are distinct third party entities "leaning the contents of communications in real time." *See Valenzuela v. Nationwide Mutual Ins. Co.*, --- F. Supp. 3d ---, 2023 WL 5266033, at *7 (C.D. Cal. Aug. 14, 2023); *see also Revitch v. New Moosejaw, LLC*, No. 18-cv-06827-VC, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019) (finding plaintiff adequately alleged defendant was a third party wiretapper); *D'Angelo v. Penny OpCo, LLC d/b/a JCPenney*, No. 23-cv-0981-BAS-

DDL, 2023 WL 7006793, at *8 (S.D. Cal. Oct. 24, 2023) (same); *Flowers v. Twilio, Inc.*, No. RG16804363, 2016 WL 11684603, at *1 (Cal. Super. Ct. Aug. 2, 2016) ("[T]he complaint makes clear that it is Twilio, not its clients, that recorded the communications …. The allegations are not, as Twilio asserts, that Twilio simply provided a software product that third parties misused.").

Here, Plaintiffs allege that Nuance "provides a voice recognition software-as-as-service," which "record[s] and creat[es] consumer voice prints." Compl. ¶¶ 5, 27, 32, 37. Nuance promises its clients that it will not only record the audio data of its customers, but that it will additionally *analyze* customer data so that it can answer questions about Chase customers, including Plaintiffs, in real time. *Id.* ¶¶ 33, 38–40. Thus, Nuance "is not like a tape recorder, or a 'tool' used by one party to record the other." *Id.* ¶ 39. "Instead, Nuance—a separate and distinct third-party entity from the parties to the conversation—uses Gatekeeper to eavesdrop upon, record, extract data from, and analyze a conversation to which they are not a known party." *Id.*; *see also Valenzuela v. Nationwide*, 2023 WL 5266033, at *7 ("Valenzuela has alleged that Nationwide allowed a third-party interloper to listen in on communications in real time. This is like *Ribas*. … Akamai is not a mechanical device being used by a party to a conversation.").

Other courts consider whether the SaaS provider "ha[s] the *capability* to use its record of the interaction for any other purpose ([unlike] a tape recorder [which] has no independent capability to divulge the recording for any other purpose but that of its owner)." *Javier II*, 649 F. Supp. 3d at 900 (emphasis in original). This approach does not require that the SaaS provider use the data for another purpose, only that the SaaS provider is capable of doing so. *Id.* (SaaS provider was a third party where "Active Prospect can use that information for other purposes, even if Javier has not alleged that they have done so in this case").[6] Courts adopting this approach have found that "companies like [Nuance] are separate corporate entities more accurately analogized to the eavesdropper in *Ribas*" because the capabilities of SaaS providers like Nuance are "significantly more sophisticated than the tape recorder in *Rogers*." *Garcia v. Yeti Coolers, LLC*, 2023 WL

[6] There is no requirement that the third party use the intercepted communication for something, as that is covered by the third clause. Cal. Penal Code § 631(a) (penalizing those "who use[]" wiretapped information). The clauses penalize "distinct and mutually independent patterns of conduct." *Tavernetti*, 583 P.2d at 741.

5736006, at *3 (C.D. Cal. Sept. 5, 2023) (SaaS provider was a third party wiretapper where "Plaintiff alleges that ASI's capabilities were significantly more sophisticated than the tape recorder in Rogers," including because SaaS provider "collect[ed] and store[d] chat transcripts"); *Javier*, 649 F. Supp. 3d at 900 (SaaS provider was a third party where "Javier pleads that ActiveProspect monitors, analyzes, and stores information about visits to Assurance's websites"); *Valenzuela v. Nationwide*, 2023 WL 5266033, at *7 n.9 (finding that "software that allows a third party to capture messages in real time and later perform data analysis" should qualify as a third-party wiretapper); *Wright v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 2023 WL 5837492, at *6 (S.D. Cal. Sept. 8, 2023) (SaaS provider a third party eavesdropper based on "allegations that Quantum retains the right to analyze and distribute recorded communications for independent purposes"); *Tanner v. Acushnet Co.*, 2023 WL 8152104, at *5 (C.D. Cal. Nov. 20, 2023) (SaaS provider a third party eavesdropper where "Plaintiff [] alleges that the Session Replay Providers cross-reference and analyze user activity across all the websites they monitor").

Plaintiffs' Complaint is replete with allegations evidencing Nuance can use the wiretapped information it collects in ways that far exceed that of an ordinary tape recorder, including but not limited to (i) analyzing "more than 1,000" characteristics of a person's unique voice, Compl. ¶ 2; (ii) using "[d]eep neural networks" to "[a]uthenticate[] customers based on the distinct characteristics of their voice," *id.* ¶ 30; (iii) creating "voice biometrics" of consumers to "[a]nalyze[] a person's unique voice signature, including physical and speech delivery factors," *id.* ¶ 31; and (iv) amassing a voice print database of individuals and tracking consumers' voice prints—which Nuance stores and retains for long periods of time, *id.* ¶¶ 32–33. In short, Plaintiffs allege Nuance has the capability to "capture[], store[], and interpret[] [their] real-time data—which extends beyond the ordinary function of a tape recorder." *Yoon*, 549 F. Supp. 3d at 1081.

In sum, Nuance is separate from Chase just as the hypothetical secretary in *Ribas* was separate from her boss. Indeed, under the *Ribas* Court's hypothetical, a SaaS provider like Nuance is even more clearly liable than the secretary following their employer's instructions. Here, Nuance is a separate legal entity (not an employee), proactively offering and conducting an eavesdropping service.

***2. The "Extension" Approach Is Contrary To The Alleged Facts, The California Supreme Court's Holding In Ribas, And The CIPA's Legislative Purpose, And Should Be Rejected.***

To argue that it is instead more akin to the tape recorder in *Rogers*, Nuance relies on *Graham v. Noom*, 533 F. Supp. 3d 823, 832 (N.D. Cal. 2021), which held that a SaaS vendor merely "provide[d] a tool—like the tape recorder in *Rogers* —that allow[ed] [its client] to record and analyze its own data in aid of [its] business."[7] Courts following this logic reason that "where the alleged third party is doing only what the party to the communication directs, then that purported third party is nothing more than an extension of the party and cannot be liable under a statute concerned only with non-party recording." *Javier*, 649 F. Supp. 3d at 899 (cleaned up).

Putting aside the legal flaws in this approach (discussed below), *Graham* is distinguishable on its facts. Under *Graham*, a company becomes a tape recorder only if its capabilities are sufficiently simple—such as merely capturing and storing data. *Graham*, 533 F. Supp. 3d at 832 (noting defendant "provides a software service that captures its clients' data, hosts it on [defendant's] servers, and allows the clients to analyze their data."). Specifically, one factor considered by the *Graham* court was that the SaaS defendant was unable to analyze or process data, and instead the defendant relayed data back to its client, where the analysis was performed by the client in-house. *Id*. Here, the services provided by Nuance reach beyond mere storage and into advanced analytics including an "AI Risk Engine" built on "voice biometrics," "behavioral biometrics," and "conversational biometrics." Compl. ¶¶ 30, 31 (Nuance utilizes "[d]eep neural networks" that "[a]uthenticate[s] customers based on the distinct characteristics of their voice[]" and "analyze[s] word choice, grammar, syntax, and other elements across messaging and transcribed voice interactions."). These allegations also make clear that it is *Nuance* (not Chase) doing the analysis. This is a far cry from a tape recorder. *Graham* therefore does not apply.

Notwithstanding this distinction, "*Graham* and its progeny are based on a misinterpretation of § 631 and *Ribas*, both of which compel the conclusion that the third party's intentions with

[7] The lead case on this approach is *Graham*, with other decisions simply following *Graham*'s reasoning without much independent analysis. *See*, *e.g.*, *Williams v. What If Holdings, LLC*, 2022 WL 17869275, at *2–3 (N.D. Cal. Dec. 22, 2022); *Licea v. Old Navy, LLC*, 2023 WL 3012527, at *3 (C.D. Cal. Apr. 19, 2023); *Byars v. Hot Topic, Inc.*, 656 F. Supp. 3d 1051, 1067–68 (C.D. Cal. 2023); *Garcia v. Build.com, Inc.*, 2023 WL 4535531, at *5 (S.D. Cal. July 13, 2023).

respect to the use of the collected information are irrelevant." *Yockey v. Salesforce, Inc.*, --- F. Supp. 3d ---, 2023 WL 5519323, at *5 (N.D. Cal. Aug. 25, 2023); *see also*, *e.g.*, *Javier*, 649 F. Supp. 3d at 900 (rejecting *Graham*); *Balletto v. Am. Honda Motor Co.*, 2023 WL 7026931, at *2 (N.D. Cal. Oct. 24, 2023) (same); *Valenzuela v. Nationwide*, 2023 WL 5266033, at *7 (same); *Valenzuela v. Super Bright LEDs*, 2023 WL 8424472, at *7 (same); *D'Angelo*, 2023 WL 7006793, at *7–8 (same). Indeed, as *Ribas* explains, the purpose of § 631 which is to prevent the "simultaneous dissemination [of the contents of a conversation] to an *unannounced* second auditor*,* whether that auditor be a person *or mechanical device*." *Ribas*, 696 P.2d at 640 (emphasis added); *see also In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 608 ("[T]he Wiretap Act's legislative history evidences Congress's intent to prevent the acquisition of the contents of a message by an unauthorized third-party or an unseen auditor.") (internal quotes omitted). To put it simply, the purpose of wiretapping statutes like § 631 is to prevent any entity from listening in on a conversation between two others, which preserves the right of the parties to "control the nature and extent of the firsthand dissemination of [their] statements." *Ribas*, 696 P.2d at 641. *Graham*'s extraneous considerations undercut the statute's protections, without any clear textual hook.

In fact, *Graham* found there could be no liability for the SaaS provider because "there are no allegations [] that [the SaaS provider] intercepted and used the data itself." *Graham*, 533 F. Supp. 3d at 832. Nowhere is such a requirement found in the statute. In fact, such a requirement is impossible to square with the logic of *Ribas*, which "did not consider the wife's friend's intentions or the use to which they put the information they obtained." *Javier*, 649 F. Supp. 3d at 900; "Instead, [*Ribas*] emphasized the privacy concerns at issue with having an unannounced second auditor listening in on the call." *Id.* (cleaned up), *Graham*'s holding also is impossible to square with the statute, which *separately* prohibits wiretapping, learning the contents of a communication, *and* using the unlawfully obtained contents of a private communication. If an eavesdropper must "use[] the data itself" in order to face liability, then there is no independent work for the "wiretapping" and "learning" prongs of the statute to do, contravening both California Supreme Court authority and basic canons of statutory construction. *See Javier*, 649 F. Supp. 3d at 900.

In addition, CIPA § 631(a) prohibits an entity from, among other things, "employ[ing]" another to wiretap." Yet, *Graham*'s holding "would imply that any third party who surreptitiously recorded a conversation between two parties would not violate § 631(a) so long as it was recording the conversation at the direction and for the benefit of a party." *Saleh*, 562 F. Supp. 3d a 520. Such a holding not only contradicts the prohibition against "employing" others to wiretap, it also "vitiate[s] the statute's protections." *Id.*

The Court should accordingly reject Nuance's argument that it is not a *third* party subject to liability under § 631.

### B. Defendant Willfully Learned The Content Of Plaintiffs' Communications With Chase In Violation Of The Second Clause Of § 631(a).

Nuance also violated the second clause of § 631(a) when it "willfully" learned the "contents or meaning of a communication in transit over a wire." *Tavernetti*, 583 P.2d at 741. To argue the contrary, Nuance contends that Plaintiffs allege that its software analyzes the "characteristics" of an individual's voice—rather than alleging that Nuance learned the "contents" of any intercepted information. Mot at. 14. This argument is based on a misreading of the Complaint and should be rejected. Plaintiffs allege, among other things, that Nuance (by its own admission) analyzes *what* consumers say. Compl. ¶¶ 2, 31 ("Gatekeeper uses 'voice biometrics' to '[a]nalyze[] a person's unique voice signature, including physical and speech delivery factors.' *Nuance also uses 'conversational biometrics' or specifically 'what [consumers] say'* by analyzing 'how a person uses language, including word choice, grammar, emojis, and acronyms…'") (emphasis added). Plaintiffs allege that in addition to "recording, examining, intercepting, collecting, and analyzing the consumers' voice prints and/or voice stress patterns," Nuance *also* analyzed the "content of their confidential conversations." *Id.* ¶ 42.

Nuance further argues the information it intercepted does not violate the statute because it is merely "record" information rather than "content" information. Record information is information *about* communications, like who is making the communication, their address, and the subscriber number. *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020) (defining "record" information as including the "name, address, and subscriber number or identity of a subscriber or customer"). "Content" on the other hand "refers to the intended message conveyed by the

communication." *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014) ("Accordingly … the term 'contents' refers to the intended message conveyed by the communication, and does not include record information regarding the characteristics of the message that is generated in the course of the communication.").

Here, during each phone call with Chase, Plaintiffs confirmed that they were the rightful account owners. *See*, *e.g.*, Compl. ¶ 46 ("During the call with Chase Bank, Plaintiff Turner was asked to make various 'yes' or 'no' statements in order to respond to questions Chase Bank asked her…"); *id.* ¶ 49 ("When Plaintiff Turner called Chase's customer support, Nuance's technology examined her voice and the voice print it has stored in its database to authenticate Turner's identity and determine the truth or falsity of her statements (*e.g.*, to determine whether Turner is the person who she purports to be)."). Thus, Nuance's role in verifying that Chase callers are who they say they are fundamentally requires Nuance to gather and examine the contents of a customer's communication to Chase. *See*, *e.g.*, *id.* ¶ 39.

To the extent that Nuance believes that what is being conveyed on the calls is itself record information—that is, that the contents of the communication is simply that a customer is identifying themselves as a Chase customer—the Ninth Circuit, in accord with other Circuits, has held that those are contents when they are the subject of the communication. *See In re Zynga Priv. Litig.*, 750 F.3d at 1107 (agreeing that "record information can become content if the record is the subject of a communication," but holding that plaintiffs failed to allege that the record information was the subject of the communication). Plaintiffs called in to identify themselves, associate themselves with their account numbers, and access their Chase accounts; that is, in this situation, the content of the communication. *See id.* ("Because the users had communicated with the website by entering their personal medical information into a form provided by a website, the First Circuit correctly concluded that the defendant was disclosing the contents of a communication.").

### C. Defendant Used The Wiretapped Communications In Violation Of § 631(a)'s Third Clause.

The third, independent clause of § 631(a) involves "attempting to use or communicate information obtained as a result of engaging in either" "intentional wiretapping" or "willfully attempting to learn contents or meaning of a communication." *Tavernetti*, 583 P.2d at 741.

Plaintiffs agree with Nuance that establishing a violation under the third clause of 631(a) first requires establishing a violation under one of the first two prongs. Mot. at 15; *see also In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 827 (N.D. Cal. 2020) ("Plaintiffs must establish that the information at issue—here, the recordings and transcripts that Defendants[] allegedly analyzed—was obtained through a violation of the first or second clauses."). Here, Nuance's services to Chase specifically contemplate the use of intercepted conversations between Plaintiffs and Chase—that is the whole point. Nuance uses its recordings of customers' voices to create voice prints, which Nuance then uses to assess whether customers are who they purport to be and sends real-time alerts to Chase to confirm the identities of customers. Compl. ¶ 32. Further, Nuance uses the content of the wiretapped conversations to provide services to other clients that are not Chase: specifically, Nuance has "amassed a massive voiceprint database of individuals, including those it considers to be 'fraudsters.'" *Id.* Nuance then boasts that it can supposedly "[a]uthenticate trusted calls and then check caller voices against a watchlist to immediately alert on known fraudsters." *Id.* A reasonable inference—that must be taken in favor of Plaintiffs at this stage of the case—is that Nuance is providing new clients with voice print data derived from prior clients.

In sum, Plaintiffs have established injury under all three clauses of § 631(a).

## III. PLAINTIFFS SUFFICIENTLY ALLEGE A VIOLATION OF CAL. PENAL CODE § 632.

Cal. Penal Code § 632(a) prohibits entities from eavesdropping on a conversation between two people without first obtaining consent. Nuance argues that its status as a "party" to Plaintiffs' communications with Chase under § 631(a) also "sinks" the asserted claims under § 632(a). Mot. at 9. But for the same reasons articulated above, Nuance is a third party to Plaintiffs' communications with Chase. Argument § II.A, *supra*. Here, *Kearney v. Salomon Smith Barney, Inc.*, is directly on point. 39 Cal. 4th 95, 102, 137 P.3d 914, 918–19 (2006). There, plaintiffs sought redress under § 632 after they had called their mortgage company "concerning their personal financial affairs, had an expectation of privacy in those communications, were unaware that their conversations were being recorded, and did not give consent to the recording of such conversations." *Id.* The Court found that the mortgage company had violated § 632 in secretly recording conversations with plaintiffs. *Id.* at 30.

Plaintiffs allege nearly indistinguishable facts. *See*, *e.g.*, Compl. ¶¶ 3, 37 (alleging "Nuance surreptitiously creates voice prints from the consumer's voice" and that "Nuance's software seamlessly incorporates into its customers' call centers, without adequate notice (or any at all) that Nuance (a third-party) is even involved in the call"); *id.* ¶¶ 39–42, 47–50, 56–60, 65–69 (various allegations that Nuance itself recorded Plaintiffs' communications without notice or consent). Nuance raises no other arguments in support of dismissal of this claim. Accordingly, Plaintiffs have alleged a violation of Cal. Penal Code § 632.

## IV. PLAINTIFFS SUFFICIENTLY ALLEGE A VIOLATION OF CAL. PENAL CODE § 637.3.

Finally, Nuance argues Plaintiffs plead "no fact" to establish a claim under § 637.3. Mot. at 16. Under Section 637.3(a), an individual is injured if their voice print or voice stress patterns are examined or recorded under two conditions: (1) to determine the truth or falsity of statements made and (2) without prior written consent. The statute reads:

> No person or entity in this state shall use any system which examines or records in any manner voice prints or other voice stress patterns of another person to determine the truth or falsity of statements made by such other person without his or her express written consent given in advance of the examination or recordation.

Cal. Penal Code §637.3(a). The words "any system" signal that the statute is written to broadly prohibit devices that examine and record voice prints, no matter what form they take. *See Weiss v. City of Del Mar*, 39 Cal. App. 5th 609, 622 (2019) ("This broad 'any decision' and 'any other powers' language cannot be reasonably construed to support Weiss's proposed interpretation that the statutory coverage is limited to decisions on an 'existing' or a 'current' project or development."). It is clear the legislature intended for new generations of lie detectors to be covered just the same as the old generation and legislature's immediate concern when passing § 637.3 does not operate to freeze the statute in amber. *Apple Inc. v. Superior Ct.*, 292 P.3d 883, 887 (Cal. 2013) ("Drafters of every era know that technological advances will proceed apace and that the rules they create will one day apply to all sorts of circumstances they could not possibly envision.") (quoting ANTONIN SCALIA & BRYAN GARNER, READING LAW: INTERPRETATION OF LEGAL TEXTS 86 (2012)).

Nuance is marketed to do exactly that: detect if a person is lying when they state their identity to a business, like Chase. *See*, *e.g.*, Compl. ¶¶ 28, 31. The Complaint includes detailed allegations concerning the function of Nuance's software. *See*, *e.g.*, *id.* ¶ 2 ("Nuance uses 'deep neural networks' and machine learning to determine whether the person is a potential fraudster or telling the truth when they identify themselves to a business."); *id.* ¶ 28 (Nuance can "authenticat[e] individuals by the way they talk, text and type and flagging potential bad actors in as quick as half a second"); *id.* ¶ 31 ("Nuance also uses 'conversational biometrics' or specifically 'what [consumers] say[.]'"). Based on these allegations, its service does not act merely as a "passcode," but a sophisticated analysis of whether the person is telling the truth when they say they are who they claim to be. At the very least, to conclude otherwise would require setting aside the allegations of the Complaint and making inferences in favor of Defendant—which the Court should not do at the pleading stage.

Nuance relies entirely on the district court's holding in *Balanzar v. Fidelity Brokerage Services, LLC*, 654 F. Supp. 3d 1075, 1086 (S.D. Cal. 2023), where the court held that another entity's voice print system did not qualify as a lie detector. But in that case, the voice print system did not require customers to identify themselves: "MyVoice does not require a caller to claim they are the account holder or to make any other claim or affirmative statement." *Id.* at 1085. Here, by contrast, when a customer calls Chase for the first time, they are asked a series of "yes" or "no" questions to identify themselves. Compl. ¶ 2. Nuance records this information and analyzes it for its truth, *i.e.* is the customer's claim that their name is X or their account number is Y true? Without a customer providing information about their identity to Nuance initially, Nuance's software cannot even get going. The goal of Nuance's software, therefore, is to start with that identity claim, and then assess its truth.

There can be no doubt that Nuance's product is an advanced version of the types of lie detectors available in the 1970s—or, to the extent it wishes to sow that doubt, Nuance will have to do so at the merits stage when the Court is not required to take the Plaintiffs' allegations as true and draw inferences in their favor. Here, Plaintiffs sufficiently allege that Nuance's software conducts a thorough analysis of a caller's voice, from which it develops and stores a voice print of a given

individual that can be used to determine the truth or falsity of an individual's statements—including whether they are who they claim to be. The statute requires no more.

**CONCLUSION**

For the foregoing reasons, the Court should deny Defendant's Motion in its entirety. If the Court determines that the pleadings are deficient in any respect, Plaintiffs respectfully request leave to amend to cure any such deficiencies. *See Roney v. Miller*, 705 F. App'x 670, 671 (9th Cir. 2017).

Date: January 12, 2024

By: */s/Neal J. Deckant*

Neal J. Deckant (SBN 322946)
ndeckant@bursor.com
BURSOR & FISHER, P.A.
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Tel: (925) 300-4455
Fax: (925) 407-2700

Rafey Balabanian (SBN 315962)
rbalabanian@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

Theo Benjamin (*pro hac vice*)
tbenjamin@edelson.com
350 N. LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: (312) 572-7212
Fax: (312) 589 6378

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 12, 2024, I electronically filed the foregoing document(s) using the CM/ECF system, which will send notification of such filing to the e-mail addresses registered in the CM/ECF system.

*/s/ Neal J. Deckant*
Neal J. Deckant